# REPORTS OF CASES

D'ETERMINED IN

# THE SUPREME COURT,

## OCTOBER TERM, 1864.

JOHN L. BOURLAND *v.* GEORGE A. HILDRETH;
R. E. GARDINER *v.* W. A. DAVIES;
THOMAS NORWOOD *v.* D. M. KENFIELD;
EDWARD SMYTH *v.* W. H. CUMMINGS;
CALEB DORSEY *v.* HUGH G. PLATT;
WILLIAM WEINBEER *v.* JOHN YORK;
P. C. BIRNEY *v.* J. H. HURD; AND
JAMES McCABE *v.* GEORGE B. KEYES.

PLACE OF VOTING. — The Constitution of this State prescribes not only what shall
be the qualifications of electors, but also the place within which the act of vot ng
shall be performed, which place is the county or district of which the elector offer-
ing his vote has been a legal resident for at least thirty days prior to the day of
election.

ACT ALLOWING CALIFORNIA VOLUNTEERS TO VOTE. — The Act of April 25th, 1863,
which provides for taking the votes of the electors of California who are in the
military service of the United States, outside of the respective counties of their
legal residence, to be returned to the Secretary of State, and counted in the coun-

21

ties of the legal residence of the electors, at the general election of 1863, is unconstitutional.

Place of Voting.—The Legislature of this State has no power to authorize electors to give their votes at any place outside of the county or district in which they have had a legal residence for thirty days previous to the election.

Malconduct of Election Officers.—Votes cast by duly qualified electors at the time and place appointed by law for holding an election, should not be rejected by reason of any malconduct on the part of the officers composing the Election Board.

Construction of Constitution.—The rules which have been adopted to govern the interpretation of constitutions, statutes, and other written instruments, have been framed to enable Courts to discern the true intentions of their authors, and when that intention has been ascertained, the Court should so construe them as to give it effect.

Same. — When the language of the Constitution is unambiguous, no construction should be given to it which is opposed to the express words of the instrument.

State Constitution. — The Constitution of the State is not a grant of power, nor an enabling Act to the Legislature. It is a limitation on the general powers of a legislative character, and restrains the legislative department only so far as the restriction appears either by express terms or by necessary implication.

Constitutionality of Legislative Acts.—An Act of the State Legislature should not be declared unconstitutional and void by the Courts unless there is a clear repugnance between the Act and the Constitution; and where there is a reasonable doubt whether the Act is repugnant to the Constitution, the Court should pronounce in favor of its constitutionality.

SANDERSON, C. J., dissenting:

Place of Voting. — There is a reasonable doubt whether the Constitution of this State prescribes the place within which the elector shall exercise the act of voting, and whether it prohibits the Legislature from making provision by law by which electors may vote outside of the county or district which has been their place of legal residence for thirty days immediately preceding an election.

Act allowing California Volunteers to Vote. — The Act of April 25th, 1863, which provided for taking the votes of the electors of California who were in the military service of the United States, outside of the respective counties of their legal residence, to be returned to the Secretary of State, and counted in the counties of the legal residence of the electors at the general election in 1863, is valid and free from all constitutional objections.

At the general election held in September, 1863, in Tuolumne County, Bourland and Hildreth were voted for for Sheriff, Gardiner and Davis for Clerk, Dorsey and Platt for District Attorney, Smith and Cummings for Recorder, and Norwood and Kenfield for Treasurer, Weinbeer and York for Assessor in District Number One, Birney and Hurd for Assessor in District Number Two, and McCabe and Keyes for Assessor in District Number Four.

The Board of Supervisors, in canvassing the votes, counted the votes of soldiers cast without the limits of the County of Tuolumne, but certified to that county by the Secretary of State, in accordance with the provisions of the Act of the Legislature passed in 1863.

The Board of Supervisors also, in counting the votes, threw out and rejected the votes cast at one precinct in the county, called Phœnix Reservoir Precinct, for the following reason: After the close of the polls the votes were counted and certified to by the Judges and Inspectors, which, with a duplicate of the same, were then delivered to the Inspector, who, the next morning, delivered the original to one Meadows, a person then unknown to him. Meadows did not deliver the returns to the County Clerk, or deposit the same in his office. Within the time allowed by law for forwarding the returns to the Clerk's office, application was made to the Inspector for the duplicate, but the Inspector replied that he had placed the duplicate under a book in his house, and that it had been stolen.

The two persons who had officiated as Judges of the Election at the Phœnix Reservoir Precinct on election day, then made out a list of the number of votes cast for each person for the respective offices voted for at the precinct on election day, and verified the same by affidavit, and forwarded it to the Clerk's office. The Phœnix Reservoir District was in Assessor District Number One, where defendant, York, and plaintiff, Weinbeer, were voted for for Assessor; and Weinbeer, according to the returns of the two Judges, received a majority of thirty-five votes over York.

By rejecting the votes cast by soldiers the plaintiffs had a majority for the respective offices for which they received votes, regardless of the Phœnix Reservoir Precinct, except plaintiff, Weinbeer; and by rejecting the soldier vote and counting the Phœnix Reservoir vote, Weinbeer had a majority.

The Board of Supervisors, by counting the votes of the soldiers and rejecting the Phœnix Reservoir vote, declared the

defendants all elected, and they received their certificates to that effect.

The plaintiffs, respectively, then commenced proceedings in the County Court of Tuolumne County to contest the election. The cases were consolidated. The County Court excluded the votes cast by the soldiers, and counted the vote cast at Phœnix Reservoir; and annulled and set aside the result of the election as declared by the Board of Supervisors, and gave judgment that the plaintiffs were elected. From the judgment of the County Court defendants appealed.

The other facts are stated in the opinion of the Court.

*George Cadwalader,* for Appellants.

The power of the Legislature being denied, the main question is where the supposed constitutional restriction is to be found which denies the right of suffrage to the soldier in the military service of the United States? Where is the article or section that compels such odious disfranchisement?

According to the approved rule of construction the burden is cast upon respondents to clearly point out the clause which has the effect claimed. For what the Legislature is not prohibited from doing, it may do; and where the power exists, the manner of its exercise by the competent body is not the subject of review by judicial authority, whose duty is confined to seeing that the legislative will is carried out according to its spirit and effect.

We believe, however, it is capable of very clear demonstration, that so far from the Constitution disfranchising soldiers, that in very clear terms it enjoins the Legislature not to abstract from them the right of suffrage; and for the purpose of voting, declares that they shall carry with them to such places as the exigencies of the military service shall require, a constructive State residence.

This occurs in Article II of the Constitution, entitled "Right of Suffrage."

Its first section confers the right of suffrage upon every white male citizen of the United States who shall have been

a resident of the State six months preceding the election, and of the county or district thirty days in which he claims his vote. While section fourth declares, that *for the purpose of voting no person shall be deemed to have gained or lost a residence by reason of his presence or absence while employed in the service of the United States.*

Without the qualifying force of the fourth section the soldier by reason of his absence would lose his right of voting; but with it he retains the right—retains his political status—as an elector of the State of California.

Thus, in *Orman* v. *Riley,* 15 Cal. 48, it was said : " The rule as fixed by the Constitution is, that the fact of such sojourn or residence as a soldier, neither creates nor destroys citizenship—leaving the political status of the soldier where it was before."

And in the language of the first section he has the right to vote at any election and place designated by the Legislature. This is the plain reading of the two sections and their obvious meaning ; a conclusion which gains force by reference to the debates in the Convention which formed the Constitution, to which we make the following allusion : The argument of counsel for respondents is chiefly directed to showing that the Constitution forbids a vote to be cast outside of the county of the elector, though he may be a resident therein, and in the military service of the United States. And in sustaining his line of argument he draws a distinction between the right of a soldier to vote and his power to cast the ballot. He admits the right of the soldier to vote, but denies the power of the Legislature to provide a ballot box for him to deposit his ballot, except within the limits of his county. We, however, submit that when the Constitution provided that for the purpose of voting the soldier by reason of his absence should not lose that right, that it intended that the Legislature should provide a practical way in which the right could be made effectual ; that it did not intend to declare that the shadow should be given and the substance retained.

It will also be noted that counsel totally ignores the fact

that the first and fourth sections are to be construed together, and that no construction of either can rightfully obtain which destroys one at the expense of the other, and that the true rule is to give effect to the object contemplated by each section; in other words, should the Court arrive at the conclusion that the first section fixed the place of the ballot box, yet as the fourth section contemplated that soldiers should vote wherever they were, that as to this class of voters the Constitution intended to exempt them from the operation of the first section as to the place of voting, otherwise the anomaly would exist of a constitutional right of suffrage given, attended by impassable barriers to its exercise.

It likewise cannot escape observation that the volunteer soldier carries with him his status as a resident and elector of the State of California, which prevents his voting elsewhere; and if his right to vote in California does not exist, he is totally disfranchised, as much so as if a subject of the Emperor of France. It is almost superfluous to say that before the judgment of disfranchisement is declared against the soldier citizen of California, a very clear warrant therefor should be found in the Constitution; and that such a result is impossible, because the Constitution in very express terms declares that for the purpose of voting the absence of the soldier shall not work a forfeiture of the right.

It is almost impossible to follow the narrow thread of the argument of opposite counsel in support of his views of the first section, as well as to appreciate his verbal criticisms on what he calls interchangeable words. Thus he contends that the words "*in which he claims his vote*," mean "*in which he offers his vote*," thus giving the same definition to "claims" and "offers."

Probably there are no two words in the English language so different in meaning. One is the demand of a right, privilege, or thing; the other is a proposal to give a thing, or recognize a right or privilege. A vote is offered at Fort Yuma, and a claim made that it be counted in Tuolumne County, according to the constitutional right of the voter. The offer

of the vote being one thing, and the claim to have it counted at the residence of the voter, another.

The succeeding theory of respondent's counsel is that the ballot must be cast in the county of which the voter is a resident. This conclusion he arrives at by ignoring the word " district," which is used in the first section in the disjunctive with " county."

Thus, the second section says: " *The county or district in which he claims his vote thirty days.*" The alteration is of course material, for residence in the district for thirty days confers the electoral right as fully as a residence for that length of time in the county. The district, whether for election purposes or otherwise, is to be defined by the Legislature; and whatever may be called by the Legislature an election district, whether a military camp or otherwise, satisfies this requirement of the Constitution. And it will likewise be observed that counties exist solely through the action of the Legislature; that is, they do not exist by force of the Constitution, but their legal existence arises from legislative action, just as valid elections exist through legislative ordination.

Should the theory of respondent's counsel obtain, there could be no voting even at Presidential, Congressional, or State elections, by residents of disorganized or non-organized counties, and yet the statute as well as the practice has always been to consider the whole State as a common election precinct on such occasions. The fact is, that under the general power to order and regulate elections, the Legislature can designate the place of receiving the ballots. And the power is plenary and exclusive, there being no limitation upon this power in the Constitution.

The reception of votes out of the State is a question of convenience, of public policy, necessary in view of the fourth section, for without it the right of voting would be barren for want of opportunity of its exercise.

Concluding our remarks undes this head, we hold the following propositions to be true:

1. That the Constitution contains an affirmative grant of

the elective franchise to the soldier, and that it was the posi-
tive duty of the Legislature to provide for its exercise.

2. That there is no prohibition against the Legislature
authorizing the reception of votes out of the State.

3. That disfranchisement is in the nature of a punishment
or a penalty, and before it can be imposed the warrant there-
for in the Constitution must be clear.

4. That all doubts as to the true construction of the Con-
stitution are to be solved in favor of legislative action.

5. That the ordering of elections, and the place and man-
ner in which ballots shall be received for electors, is exclusively
confided to the Legislature, and that therefore the Courts have
no supervisory power. (*Franklin* v. *State Examiners*, 23 Cal.
173.)

6. That the Constitution, in granting the right of suffrage
to soldiers absent from the State in the service of the United
States, cannot be so construed as to prevent the Legislature
from providing for the exercise of that right in the only prac-
ticable manner.

7. That the Legislature may do that which is not expressly
forbidden by the Constitution. (17 Cal. 23, 547 ; 13 Cal. 159 ;
12 Cal. 378 ; 6 Cranch. 128 ; Sedgwick, 592 ; *Cohen* v.
*Wright*, 22 Cal. 293.)

In addition to the general authority of the Legislature over
the right of suffrage, Section 18, of Article XI, declares that :
" The privilege of free suffrage shall be supported by laws
regulating elections, and prohibiting under adequate penalties
all undue influence thereon from power, bribery, tumult, or
other improper practice." This section is a power given and
an injunction to the Legislature to pass laws supporting free
suffrage by elections.

The power to regulate elections implies the power to pro-
vide the necessary means by which all electors may vote.

The limitations upon this power, in Article II, designate
merely the class of persons who may or may not vote—and
does not limit the power of the Legislature to provide adequate
methods by which all qualified electors may vote. The word

"regulate" implies the right to adopt the necessary means to effect the given object—and what the necessary means are, the Legislature is the exclusive judge.  (*McCulloch* v. *Maryland*, 4 Wheat. 316.)

It may be remarked in this case that as to voting, the Constitution is not "self executing," but requires legislative action, ordering elections and establishing precincts, before any elector under the Constitution can vote—and as a consequence the Legislature by its "non-action" can in effect destroy the elective franchise.

The right to vote is a franchise.  It has a money value; that is, Courts, by compensation in the way of damages, protect it. (2 Mass. 236 ; 11 Mass. 350 ; 12 Pickering, 485.)

In the case of *Warren* v. *Mayor of Charleston*, 2 Gray, 98, an Act of the Legislature of Massachusetts establishing a Congressional District was held unconstitutional, because it failed to provide means whereby a part of the qualified voters of the district could vote for members for Congress.

While voting is a right of the elector which cannot be taken from him, except in punishment for a felony, for which he shall have been first duly convicted, it is also ranked among the high duties which the citizen owes to his Government, and the power exists in the Legislature to compel its exercise, and to punish its refusal or neglect.

Where is the restriction upon the legislative power that compels them, in ordinary elections, to provide no way in which the "soldier electors" may vote—may perform the *rite* which is inestimable to them, and the duty which all republican States impose upon their citizens?  The lawmaking power, embracing the regulation of "free suffrage," is not fully exercised until all "*electors*" have a reasonable opportunity afforded them for its exercise, and with conclusive force it applies to those men whose absence the necessities of the State compels.

Article II does not in any sense fix the place of voting— nor does it confine the elector to any particular place for the

deposit of his ballot—but section one says that he may vote at all elections authorized by law.

Who may vote at all elections authorized by law? The qualified electors. Who are the qualified electors? Persons white in color, of the age of twenty-one years, resident in the State six months and in the county thirty days, not idiotic, insane, or convicted of an infamous crime.

This section, to bear the interpretation given by the opinion, must contain after the words " shall be entitled to vote at all elections which are now, or hereafter may be, authorized by law," the addenda, *held in the county of which he is actually resident, and not elsewhere.*

Neither can any argument be drawn against the law of April 25, 1863, by reason of its extra-territorial operation. A State is something more than a piece of land with defined boundaries. It is the land, the qualified electors, and their government. The municipal laws for a hundred purposes have an extra-territorial operation, and acts done under them abroad in conformity with these laws, have the same effect as done within the actual jurisdiction.

We have a number of laws which authorize acts to be done outside of the State. Thus we take depositions within almost every State of the Union in conformity with our own laws. We appoint officers to take acknowledgments of deeds out of the State. A will executed out of the State according to the formalities of the State law is just as valid as if made within its limits. We authorize a summons to be served out of the State. All these acts are common and valid. We do not profess to have the power to compel their performance, but we have the authority to say when the acts are done under the formalities of our statutes, under the guards, checks, and restrictions imposed by us, that we will give them the weight and authority which they would have if done upon our own soil.

*Caleb Dorsey,* for Respondents.

The Constitution of a State, like an Act of the Legislature,

must be construed according to its spirit and intent, taking into view the right intended to be secured, the evils to be remedied, and the dangers to be guarded against. (Smith's Commentaries, 455.)

The Constitution of the State of California intended to secure to all of its citizens the *right of suffrage;* and it also intended to guard that right against abuse by prescribing the mode and manner in which it is to be enjoyed. Were this not the case, it would have only secured to the people of the State the right, and left the Legislature unrestricted in its power of prescribing the mode and manner in which it is to be exercised. But since the Constitution contains a provision directing how this right is to be exercised, it is clear that it has to a certain extent restricted the legislative power relative thereto, and has established a fixed, certain, and permanent rule by which the exercise of this right is to be governed, and which the Legislature is never to modify, alter, or change. And in order to ascertain if the Act of the Legislature, approved April 25th, 1863, is unconstitutional, it is only necessary to compare it with the Constitution itself and see if it falls within the restriction imposed by the Constitution upon the power of the Legislature in reference to the right of suffrage. If it does come within that restriction, it is clearly unconstitutional.

Article II, Section 1, of the Constitution of the State of California provides that every white male citizen of the United States, etc., of the age of twenty-one years, and who shall have been a resident of the State six months next preceding the election, and the county or district *in which* he claims his vote thirty days, shall be entitled to vote, etc.

This section of the Constitution makes a residence of six months in the State, and thirty days in the county or district in which the voter claims his vote, a necessary qualification to the exercise of the right of suffrage. What was the object of the framers of the Constitution in requiring a residence in the State, and thirty days in the county or district? Why would not one day's residence have done as well? These

provisions were intended to protect the exercise of this right from abuse. It was to enable persons residing in the neighborhood where the voter intended to reside to become acquainted with him and know that he was *bona fide* a resident of the State and county before he could vote. The time required by the Constitution was evidence of his *bona fides*, and taken as proof that he was a resident of the State and county. This enabled the people of the county or district to guard against illegal voting by challenging the votes of those who have not been residents of the State, county, or district the length of time required by the Constitution, and of all strangers whom they might suspect of illegal voting. Residence in the State for six months, and in the county or district for thirty days, are constitutional safeguards thrown around the exercise of the right of suffrage to guard it against fraud and abuse, and which the Legislature has no power to modify or change. These safeguards are as much a part of the Constitution as that portion of it which guarantees the right itself, and the Legislature is forever inhibited from interfering with them.

The object of the constitutional provision which makes a residence in the State six months, and in the county or district thirty days, being intended to secure the purity of the ballot box, and guard it against fraud and abuse, any Act of the Legislature which is not in harmony with the Constitution in securing these ends is unconstitutional and void.

The Legislature has no power to shorten the time of residence in a State, county, or district; for if it had it would create by its action the very evils the Constitution intended to remedy, and open the door to the very frauds and dangers it tried to guard against. Any Act of the Legislature which is repugnant to those provisions of the Constitution which were intended to remedy particular evils or guard against certain dangers, or which is subversive of the ends which they are intended to accomplish, is unconstitutional and void. (*Colton* v. *Smith*, 2 Serg. & Rawle, 268; 41 Penn. 421.)

It is much better that the constitutional provisions relative

to the right of suffrage be enforced, and have the ballot box pure, free from fraud and corruption, than give effect to a law which will open the door for frauds and abuses, and which would endanger the very right itself.   And it is the duty of the Courts to construe all laws relating to the right of suffrage in reference to the attainment of the ends which the Constitution intended to accomplish.

But, even admitting for the sake of the argument, that the Legislature could pass a law enabling the soldiers to vote in the State, out of the county or districts where they reside, can it do so to enable them to vote out of the State?   We think not.   The limits of the State define the jurisdiction of the State; the laws can have no force beyond those limits.   It can enforce no law or punish any crime beyond its limits. (Story's Conflict of Laws, §§512, 539 ; 6 Johns. Chan. 357.)

Legislative bodies do not usually in their acts of legislation use language to limit their operation in this respect, but use general language, and the limitation is implied.   (*Miller* v. *Ewer*, 27 Maine, 517.)

If the election is out of the State, the Legislature has no *jurisdiction over the place where it is held*, nor over the persons of the parties who hold or vote at said elections.   It cannot compel said elections to be held or prevent them from being held.   It is perfectly powerless to punish any violation of the election law which is committed without the limits of the jurisdiction.

Story says on the same subject : " It is plain that the laws of one country can have no intrinsic force, '*proprio vigore,*' except within the territorial limits and jurisdiction of that country.   They can bind only its own subjects, and others who are within its jurisdictional limits ; and the latter only while they remain therein.   No other nation, or its subjects, are bound to yield the slightest obedience to those laws. Boullenois says : ' Of strict right all the laws made by a sovereign have no force or authority except within the limits of his domains.' "

*H. P. Barber*, also for Respondents.

The Act of April 25th, 1863, allowing a particular class of the community in the military service of the United States to vote in one county for county officers in another county, is unconstitutional.

A Constitution is to be construed with reference to the laws existing at the time of its adoption and the practice under them. (2 Gill. & John. 254; Smith's Com. on Cons. 629, Sections 481, 482.)

The *words* of a Constitution furnish the only test to determine the validity of an Act of the Legislature, and those words must govern.

"I am thoroughly convinced that the *words of the Constitution* furnish the *only test* to determine the validity of a statute, and that all arguments based on general principles outside of the Constitution must be addressed to the people and not to us." (Mr. Chief Justice Black, in *Sharp* v. *Philadelphia*, 9 Harris, 162.)

The Constitution of California, Article II, section one, provides that every white male citizen of the United States of the age of twenty-one years, " who shall have been a resident of the State six months next preceding the election, and of the county or district in which he claims his vote thirty days, shall be entitled to vote at all elections which are now or hereafter may be authorized by law."

" SEC. 4.   For the purpose of voting no person shall be deemed to have gained or lost a residence by reason of his presence or absence while employed in the service of the United States, nor while engaged in the navigation of the waters of this State or of the United States, or of the high seas, nor while a student of any seminary of learning, nor while kept at any almshouse or other asylum at public expense, nor while confined in any public prison."

Now, taking these provisions according to their popular and commonly understood sense, can there be any doubt that the county in which a person " claims his vote " is the county of

his actual residence, and where he is present, *in propria persona*, tendering his vote to the Inspector. In other words, it is the county where he actually offers his vote.

Under these plain provisions of the Constitution, two things are requisite :

1. He must have resided in the county *where he offers his vote*, thirty days.

2. He must be *actually present* in that county to deposit his vote for its county officers.

Supposing him to be a resident of Tuolumne County, he does not lose such residence by being in the United States service in Los Angeles; then how can he, being an *actual resident* of Tuolumne, proffer his ballot for county officers of Tuolumne, in Los Angeles, of which he is *not* a resident?

The Constitution provides, that to entitle him to vote he must have been a resident of the county where he offers his ballot for the space of thirty days; and further provides, that while in the United States service he shall neither gain or lose a residence. *If, then, he does not gain a residence in Los Angeles, he cannot vote there ; if he does not lose a residence in Tuolumne, he must constitutionally vote there, or not at all.*

We have before seen that a Constitution is to be construed according to the laws and condition of the people existing at the time of its adoption, and the then common and popular construction of words and phrases. Is there any one so hardy as to pretend that the phrase, " the county or district in which he claims his vote," as specified in our Constitution, referred to anything else than the county or district where the voter was *actually* present tendering his ballot? or will any one contend that it was the intent of the framers of the Constitution that a resident of Del Norte might vote in San Bernardino for county officers of Del Norte because he happened to be in San Bernardino on election day?

The Constitution requires a party, before voting (that is, going up to the polls and depositing his vote in the ballot box) in such county, to have been a resident of it for thirty days,

and any law contravening that provision is unconstitutional and void.

The constitutional provision that no person in the United States service shall lose his residence by reason thereof, gives such person no extra rights; it merely provides that if on election day he happens to be personally present in the county or district *where he was entitled to vote*, he can still vote *there*, notwithstanding he may not be an *actual* resident of such county or district.    (Gilb. Debates on Cons. of Cal. 308.)

The Act is unconstitutional as to soldiers voting for county officers within the State and out of such county—*a fortiori as to soldiers voting out of the State*.    (27 Maine, 509; Story's Confl. of Laws, §512, and note; Ibid, §539.)

The word " vote " has in civil elections a well defined and understood meaning; when we speak of a man's " voting " in a certain county, we mean his being *personally present* THERE, and depositing his ballot THERE, and nowhere else; and such was the popular sense in which it was understood at the adoption of the Constitution.

The "Phœnix Reservoir" and "Seiver's Ranch" returns ought to be given to the persons there receiving the votes.

The votes as set forth in the statement are admitted to be correct, and it was solely owing to malconduct on the part of the Board of Judges, or some of them, that the votes were not returned in proper form to be canvassed.

The Court below has decided that the acts of the Judges, as set forth in the statement, amounted to malconduct; and such malconduct is made a specific cause for contesting an election.    (Wood's Dig. p. 380, Art. 2,155, Sub. 1.)

The Board of Supervisors, in canvassing the votes, act merely in a ministerial capacity.    (4 Cowen, 297; 23 Wend. 228; 3 Hill, 42; 22 Barb. 72; 8 N. Y. [4 Selden,] 67; 14 Barb. 259.)

The County Court, on the contrary, in a contested election case, acts judicially, and can go behind the election returns and the certificate of the Supervisors.    It determines who is *actually* entitled to the office on the *legal votes cast*, and may

either adopt or reject the result as declared by the Board of Canvassers. (8 Cowen, 102 ; 4 Cow. 297 ; 20 Wend. 12 ; 5 Denio, 409 ; 14 Barb. 259 ; 8 N. Y. [4 Selden,] 67.)

By the Court, SHAFTER, J.

At its session in 1863 the Legislature passed an Act, requiring the Adjutant-General of this State to make out a list, on or before the 15th day of July, 1863, of the names of all electors, resident of the State of California, who should then be in the military service of the United States, and to deliver the list to the Secretary of State on or before the said day.

The Act further requires the Secretary of State to classify and arrange the list so returned to him, and to make therefrom separate lists of the electors belonging to each regiment, battalion, squadron, and battery, from this State, which shall then be in the service of the United States ; and on or before the 20th day of July, 1863, to transmit to the commanding officer of each regiment, battalion, squadron, and battery, a list of the electors belonging thereto, specifying the name, residence and rank of each elector ; and, also, " the County, Congressional, Judicial, Senatorial and Assembly Districts, for officers of which the electors respectively should be entitled to vote."

The Act further provides that on the day fixed by law for holding the State election in the year 1863, " a ballot box, or other suitable receptacle for votes shall be opened, and votes received from the electors, whose names are upon said list, at each place where a regiment, or battalion, squadron, or battery of California soldiers, in the service of the United States, may be on that day ; at which time and place the electors, whose names are upon said list, belonging to such regiment, detachment, squadron, or battery, shall be entitled to vote for all officers, for which, by reason of their residence in the several counties of this State, they are authorized to vote at elections in the several counties and districts in which they reside ; and the vote so given, at such time and place, shall be con-

23

sidered, taken, and held to have been given by them in the respective counties of which they are residents."

The operation of the Act is limited to a single year—1863.

It appears from the record that under this Act two hundred and fifteen soldiers, having their legal residence in the county of Tuolumne, voted at the general election in September, 1863, for county officers of that county, and for Assessors in the different districts therein. It further appears that ninety of the two hundred and fifteen votes were given in camps and stations without the limits of the State, and one hundred and twenty-five within its limits, but outside the County of Tuolumne; and it also appears from the record that, if all of the two hundred and fifteen votes are to be excluded from the canvass, the respondents have a majority of votes in their favor for the offices for which they were respectively candidates, with the exception of the respondent Weinbeer.

The reason assigned on behalf of the respondents for excluding the two hundred and fifteen votes named is the alleged unconstitutionality of the Act of 1863.

Section one, Article II of the Constitution is as follows:

"SECTION 1. Every white male citizen of the United States, and every white male citizen of Mexico who shall have elected to become a citizen of the United States under the treaty of peace exchanged and ratified at Queretaro on the 30th day of May, 1848, of the age of twenty-one years, who shall have been a resident of the State six months next preceding the election, and the county or district in which he claims his vote thirty days, shall be entitled to vote at all elections which are now or hereafter may be authorized by law; *provided*, that nothing herein contained shall be construed to prevent the Legislature, by a two-thirds concurrent vote, from admitting to the right of suffrage Indians or the descendants of Indians, in such special cases as such a proportion of the legislative body shall deem just and proper."

In this section the qualifications are stated upon which the right of suffrage is made to depend, viz: citizenship, particu-

lar sex, color, age, residence.   The reason why the right to
vote was made by the framers of the Constitution to depend
upon these conditions are apparent.   Citizenship was required
with a view to keep the Government in the hands of those
who owed allegiance to it.   Color was established as a test in
obedience to a prevailing opinion.   Discrimination was made
between the sexes under a conviction that it was required by
the best interests of both.   The age of majority at common
law was made requisite in· order to secure to the State self-
reliance and capacity in those appointed to govern.   Residence
in the State for six months preceding any given election was
required so that citizens, even, should not deal with public
questions through the ballot box until they at least had had
the benefit of an opportunity to learn the public wants, of
concerting measures the best calculated to provide for them,
and of selecting proper men to carry those measures into effect;
and residence in given localities within the State for thirty
days next preceding any election appointed by law was pre-
scribed so that the voter, in the interval, might attain to some
just understanding of local interests before charging himself
with the responsibility of political action concerning them.

It is not claimed for the respondents that the Act of 1863
is unconstitutional for the reason that it authorizes voting, free
of these tests, or free of any one of them ; and it is obvious
that the Act of 1863 silently assumes them all, except the last,
and as to that—the qualification of residence—it is put expressly
in the Act as a condition upon which the polling of the mili-
tary vote is to depend.   The point of contest relates to a mat-
ter with which the qualifications of voters have, in strictness,
nothing to do.   It is insisted for the respondents that the Con-
stitution fixes the place or places at which the duly qualified
electors are to perform the act of voting.   This proposition
is denied by the appellants, they insisting that the matter is
left entirely to the control of the Legislature.

As to the power and the duty of the judicial department of
the Government to set aside a legislative Act if found to be
in conflict with the Constitution, there can be no question ;

and the considerations by which Courts are to be guided in the exercise of that power are well settled. The constitutional question, now to be passed upon, was determined, in effect, by the Constitution itself at the moment the Act of 1863 received the signature of the Executive, and in that point of view our distinctive service is one of inquiry rather than of judgment, and in the conduct of the inquiry we can do no more than interrogate the Constitution itself and report its responses when we shall have ascertained them. Though the judiciary, like other departments of the Government, is bound to use its powers so as best to promote the public good and fulfil the will of the people, still we can know nothing of that will, except as it has found expression in the Constitution; nor can we, under pretext of promoting the public welfare, usurp powers with which the people have never invested us.

The great object, with reference to which all the rules and maxims that govern the interpretation of statutes, Constitutions, and other written instruments have been framed, is to discern the true intent of their authors, and when that intent has been ascertained, it becomes the duty of the Court to give effect to it, whatever may be the convictions of the Judges as to its wisdom, expediency or policy.

One of the cardinal rules of interpretation referred to is, that in the absence of ambiguity no exposition shall be made which is opposed to the express words of the instrument. "Speech is the index of the mind, and that exposition which corrupts the text is accursed." (Broom, 396.) When an Act is conceived in clear and precise terms—when the sense is clear and manifest and leads to nothing absurd, there can be no reason to refuse the sense which it naturally presents to the mind. To go elsewhere in search of conjecture in order to restrain or limit the instrument, would be but to elude its force. If Courts were at liberty to search for foreign reasons to maintain what was not to be found in any just sense of the words used, then a statute or Constitution might be used for the accomplishment of a purpose which it was the intention of the lawgiver to discountenance and withstand. (Smith's

Com. 688 ; 7 Mass. 524.) A writer on American law says : " When the meaning is satisfactorily perceived and understood, there is no room for a liberal or strict, or large or narrow, or other construction, than according to the meaning." (6 Dane's Ab. 600.)

The Supreme Court of the United States has held that where a law is plain and unambiguous, whether it be expressed in general or limited terms, its authors must be intended to mean what they have plainly expressed, and consequently no room is left for construction. (7 Cranch. 52.) Mr. Dwarris lays down the rule thus : " Though the Judges are to explore the intentions of the Legislature, yet the construction to be put upon an Act of Parliament must be such as is warranted by, or at least not repugnant to, the words of the Act. Courts must not, in order to give effect to what they may suppose to be the intention of the Legislature, put upon the provisions of a statute a construction not supported by the words."

It was held in *Rex* v. *Ramsgate*, 6 B. & C. 712, " that where the Legislature has used words of a plain and definite import, it would be very dangerous to put upon them a construction which would amount to holding that the Legislature did not mean what it has expressed. The fittest course in all cases where the intention of the Legislature is brought into question is to adhere to the words of the statute, construing them according to their nature and import, in the order in which they stand in the Act of Parliament." Mr. Dwarris, in commenting upon *Rex* v. *Inhabitants of Great Bentley*, 10 B. & C. 520, remarks that " The most enlightened and experienced Judges have for some time lamented the too frequent departure from the plain and obvious meaning of the words of the Act of Parliament by which a case is governed, and themselves hold it much the safer course to adhere to the words of a statute construed according to their own import, than to enter into inquiry as to the supposed intention of the parties who framed the Act. Courts are not to presume the intentions of the lawmaker, but to collect them from the words; and they have nothing to do with the policy of the law. This is

the true sense in which it is so often impressively repeated that the Judges are not to be encouraged to direct their conduct 'by the crooked chord of discretion, but by the golden metwand of the law;' *i. e.*, to collect the sense of the lawmaker by a sound *interpretation of the language, according to reason.*" (Dwarris on Stats. 702, 703.)

Mr. Justice Blackstone has remarked that " words are generally to be understood in their usual and most known signification, *not so much regarding the proprieties of grammar* as their general and popular use; that if words happen to be dubious their meaning may be established by the context or by comparing them with other words and sentences in the same instrument; that illustrations may be further derived from the subject matter with reference to which the expressions are used; that the effect and consequence of a particular construction is to be examined, because if a literal meaning would involve a manifest absurdity it ought not to be adopted; and *that the reason or spirit of the statute,* or the causes that led to its enactment, are often the best exponents of the words, and limit their application. (1 B. Com. 59, 60; Sto. Com. Sec. 400.)

It appears from the foregoing citations that laws are to be construed according to the intention of their authors; that the words used are to be first resorted to as furnishing the best index of intention; that if the meaning of the words in their popular import is clear, and is in harmony with the context and the subject matter, and comports with the causes that induced the enactment, then the words themselves determine the intention; that the words so illustrated should be adhered to by Courts, however unwelcome the results may be to the Judges or others, or however opposed they may be to mere personal views of public policy. In the language of the Supreme Court of the United States (*Van Howes' Lessees* v. *Dorrance*, 2 Dallas, 309,) : " The Constitution of a State is stable and permanent—not to be worked upon by the temper of the times, nor to rise and fall with the tide of events. Notwithstanding the competition of opposing interests and the

violence of contending parties, it remains firm and immov-
able as a mountain amid the strife of storms, or as a rock in
the ocean amid the raging waves." Chancellor Kent has
justly said : " From the mass of powers necessarily vested in
the Legislature, and the active and sovereign nature of those
powers, from the numerous bodies of which the Legislature is
composed, the popular sympathies which it excites and its
immediate dependence on the people by means of frequent
periodical elections, it follows that the legislative department
of the Government will have a decided superiority of influ-
ence. It is constantly acting upon all the great interests of
society and agitating its hopes and fears. It is liable to be
constantly swayed by popular prejudice and passion, and it is
difficult to keep it from pressing with injurious weight upon
the constitutional rights and privileges of the other depart-
ments. It is only by the free exercise of its powers that Courts
of justice are enabled to repel assaults and to protect every
part of the Government and every member of the community
from undue and destructive innovations upon their chartered
rights."

It is, however, to be borne in mind that the Constitution is
not a grant of power or an enabling Act to the Legislature.
It is a limitation on the general powers of a legislative char-
acter, and restrains only so far as the restriction appears either
by express terms or by necessary implication, and the delicate
office of declaring an Act of the Legislature unconstitutional
and void should never be exercised unless there be a clear
repugnancy between the statute and the organic law. These
principles were repeatedly asserted by the late Supreme Court,
and have never been questioned by us. In a doubtful case the
benefit of the doubt is to be given to the Legislature ; but it
is to be remembered that the doubt to which this rule of con-
struction refers is a reasonable doubt as distinguished from
vague conjecture or misgiving. The point is well presented
by Mr. Chief Justice Buchanan in *The Regents, etc.* v. *Williams*,
9 Gill. & J. 383 : "It has been said that a legislative Act
should not be pronounced unconstitutional or invalid in a

doubtful case, nor should it where the doubt is *bona fide* and well founded and not the result of disinclination to deny the authority of the Legislature, which all must feel and to which none should yield in violation of a solemn duty. Where a Judge is satisfied, upon full consideration, that an Act is contrary to the Constitution, the supreme law which he is bound to obey and which must prevail over any Act that comes in conflict, and cannot stand with it, he has no choice, and all that is left for him is honestly and fearlessly to do his .duty, from the faithful discharge of which, however unpleasant the task, no upright Judge can shrink if he will."

We have called attention to the foregoing rules of interpretation and construction at the outset, for the reason that they suggest the true methods by which the principal question raised by the record is to be investigated, and determine also the *criteria* of judgment with reference to which it should be decided. And now these general matters having been disposed of, we shall proceed to an examination of the case.

That part of Section 1, Article II, having the most important bearing on the question, is the following : " A citizen, etc., * * * who shall have been a resident of the State six months next preceding the election, and [of] the county or district in which he *claims his vote* thirty days, shall be entitled to vote at all elections," etc.

The words " claims his vote" are not used to define the word " residence." That word required no definition, for when the Constitution was adopted its meaning had been settled for ages. Nor are the words used for the purpose of indicating to the citizen in advance that he must reside in one county or district rather than in another in order that he may become an elector, for it is obvious that every citizen is left at liberty to reside in the county or district of his choice. Nor are the words used for the purpose of stating an electoral qualification either distinct from or anywise affecting those previously enumerated, for it would be absurd to suppose that the Constitution intended that a citizen should make a premature, and therefore false claim to " his vote," in order to qualify himself

to make a valid one. What, then, is the meaning of the words
" claims his vote," in the relation in which they stand ?   How-
ever clear our own convictions may be as to their real meaning,
and however free from difficulty we may consider the question
to be, if both the attention and the understanding are confined
to the essential conditions of judgment, still, the acknowledged
importance of the case, and the just consideration due from
one department of the Government to another, call for a full
exposition of the grounds upon which those convictions are
based.

We have no doubt that the Convention by which the Con-
stitution was framed, was unanimous upon the question of
their meaning.   We see no ambiguity or want of precision in
the words, and as the Journals of the Convention show that
almost every provision and passage in the Constitution became
the subject of discussion and controversy, but that the words
in question escaped both, we take it for granted that the Con-
vention was not only unanimous as to the purpose, and as to
the merit of the purpose for which the words were used, but
also considered that the common intent found, in the words
used, apt and plenary expression.   We have every reason to
believe, and do believe, that at the time the Constitution was
adopted, and for at least twelve years thereafter, a like unan-
imity prevailed among the people ; and the whole course and
the whole history of our legislation, during the interval
named, demonstrate that the unanimity of the people ex-
tended to and controlled the public councils.   Had the words
in question been ambiguous and indecisive in fact, it would
have been detected; had it been detected the discovery
would have been turned to account, or it is highly probable
that some one at least, in the Legislature or out of it, would
have turned the discovery to account, by securing or attempt-
ing to secure the legislative sanction to a system under which,
if all the migratory vote, both within and without the State,
was not polled at every current election, it would not have
been for want of opportunity afforded.   This entire unanimity
of popular and legislative opinion, extending alike to both

24

the points named, is all the more suggestive, when we consider the earnestness and virulence of party contests during the period when that unanimity subsided.

The passage calling for a six months residence in the State and of thirty days in the county or district in which the elector claims his vote, contains six distinct conceptions. The first is of a fact—residence; the second is of place, represented by the words " county or district;" the third is of an event, represented by the words " claims his vote;" the fourth is of a relation, showing that the fact of residence is to obtain *in* a county or district; the fifth is of relation also, to the effect that the event of an elector's " claiming his vote " is to transpire *in* a county or district also; and the sixth is of the result of the last two conceptions when combined—that is to say, of the sum total of the meaning of the entire passage. The amount of it is this : The county or district " in which " the fact (residence) is gained, is the identical county or the identical district in which the event of claiming a vote is to transpire, and, *e converso*, the event is to transpire in the county or district of the residence. Neither the fact nor the event can, in the nature of things, occur irrespective of place, and the fact is to be gained and the event is to be enacted in the same place, by express constitutional appointment. The event referred to is a transaction to which the Government is a party, and is to transpire after a residence has been gained. The Government, through its officers, meets the elector in his proper person, and receives from him a " ballot," by allowing him to deposit it in a " ballot box," if he then and there offers to do so (Constitution, Sec. 6, Art. II; Sec. 2, Art. X.) The correctness of the construction, and of our conclusion as based upon it, may be verified by any one who will consent to look steadily at the passage hereinbefore quoted, and mark his own intuitions. To be known it must be seen; and if it cannot be seen, it never can be known. Though the point— the facts being given—and they are all apparent on inspection—like the truth of a mathematical axiom, does not admit of direct reasoning, still it may be illustrated. The twenty-

fourth section of our Statute of Conveyances contains a provision that "every conveyance of real estate   *   *   *   to operate as notice to third persons shall be recorded in the office of the Recorder of the county *in which* such real estate is situated." By section eighteen of the Practice Act certain actions "shall be tried in the county *in which* the subject of the action or some part thereof is situated." By section twenty certain actions "shall be tried in the county *in which* the defendant resides." Each one of these passages contains a statement of a fact and of an event, and in each of them the place of the fact and the place of the event are the same, beyond controversy.

Again, it is provided in the second section of the First Article of the Constitution of the United States as follows : "No person shall be a Representative who shall not have attained the age of twenty-five years and been seven years a citizen of the United States, and who shall not when elected be an inhabitant of that State *in which* he shall be chosen." This provision involves the following elements : 1st, personal qualifications, of which the fact of inhabitancy is one ; 2d, place, a State ; 3d, an event or transaction, viz : the choice of a person by the people of a State to represent them in the House of Representatives. A State is the place of the inhabitancy, a State is the place of the event, and both the fact and the event are to transpire in the same State. Should the question be asked where is the act of choosing a Representative to Congress to be performed ? the very text of the Constitution would answer—in the State of which he is an inhabitant. Without refining upon it, that is what we conceive to be "the plain and obvious meaning of the words used."

The event in hand is a transaction as distinguished from a mere status, or being, or rest, mental purpose present or ulterior, or opinion, or conviction, on any point of mere personal right. The transaction is overt. A duly qualified elector is an actor in it. He causes it, brings it about by open conduct on his part, instead of suffering or merely enduring it. He does something, and the thing which he does is represented by

the words, " claims his vote." To every practical intent the elector is a part of the event, and he accomplishes it by means of a visible instrument which he handles, and which is itself a part of the event. The event is to transpire in the county or district "in which" the elector has his residence for thirty days previous to its occurrence, to the exclusion of the balance of space whether within the State or outside of it. The analysis of the disputed passage upon which our conclusion is based is not after the manner of the grammarians, but is an analysis of the governing conceptions that enter into the passage. The argument does not proceed upon the "proprieties of grammar," but upon ideas in their just relations.

The foregoing is a general exhibition of the grounds that have forced the conclusion to which our minds have been brought, and if the case was not one of extraordinary concern all further discussion would be forborne.

Subsequently to the judgment rendered by this Court on the first hearing of the case, the Legislature, assuming, and believing doubtless, that the judgment was erroneous, re-enacted the Act of 1863 ; and furthermore, the Supreme Court of Iowa has recently given the question involved a different resolution. All of which appearing, it is due to the question, to the law, and to all who are interested in its just administration, that the matter should be more fully discussed ; and in doing so we shall proceed as in the presence of the law, and as in the presence of its great ministry both living and dead.

It will be observed that our conclusion is based, in the main, upon the analysis given of the passage in dispute. To this method of investigation we apprehend no objection can be taken, for it is the very method which the authorities cited require us to pursue. When the question raised is one of construction, the controlling grounds of reasoning are not to be sought for primarily in preambles nor in titles or headings ; nor in the proprieties of grammar, nor in the assumption that propositions of compact or enactment are always simple and never compound ; nor in the assumption that they are always direct and never incidental ; nor in the assumption that the

lawgiver never unites two distinct, but related elements in one general provision; nor in the assumption that if the lawmaker had intended a given thing, that he would have expressed his intention in some mode which the mind of the reasoner can conceive of as being more felicitous than the particular language adopted. On a question of constitutional construction, if the main and principal purpose were to develop a doubt as to the meaning, this method of *a priori* reasoning from the real or supposed rules of correct composition would undoubtedly be apposite to the end proposed, and would answer also as a shelter to the doubt which an observance of them had excited. But when a question of the character named is presented, the primary inquiry is not after a doubt, but after the true intent and meaning of the instrument or passage to be interpreted; and the intendment, to start with, is that the framers of the instrument have not failed to express their intentions in intelligible language; and it is only after the words and the context and the subject matter have all been reasonably exhausted, that the question of " doubt " can properly be considered, or even approached. And it may be here added, that there is not one of the supposed rules of correct composition referred to, that finds any practical recognition in the Constitution or in the general literature of the language. Compound propositions occur in the Constitution much more frequently than simple ones—incidental propositions are found on every page—and instances in which distinct but related provisions are found in the same section are not at all unfrequent; and our own reports afford multiplied proofs that the distinction between clearness of expression on the one hand, and mere infelicity of expression on the other—whether real or supposed—has never yet been lost sight of.

There is really but one question presented, in our judgment, and that relates to the correctness of the analysis which we have given of the disputed passage. That analysis, it will be remembered, gives as results, 1st. A fact—" residence;" 2d. Place—" county or district;" 3d. An event, as distinguished from the fact of residence—" claims his vote;" 4th. A rela-

tion—residence in a county or district; 5th. A relation—the
event of claiming a vote in a county or district; 6th. A rela-
tion also—it being one of absolute identity between the county
or district of the "residence," and the county or district of the
"event" named. As we have already remarked, the question
of the correctness of this analysis is primarily to be deter-
mined by inspection, and we may add, in utter forgetfulness,
for the time being, of the consequences to which it may lead.
The exact question at this point then is, not whether the Con-
stitution fixes the place at which the act of voting is to be
performed, but whether the passage named at once admits and
calls for the analysis given. It is insisted that the analysis is
a mistaken one, and that the passage, when taken to pieces,
shows only the following results: 1st. Residence; 2d. Place—
county or district; 3d. A relation—"residence" in the "place"
named. This analysis denies three of the results of our own—
that is, it denies that the words "he claims his vote" sets forth
an event or transaction distinct from the fact or status of resi-
dence, and that event or transaction being expunged, the fifth
and sixth elements of the analysis go with it, of course, for
they are directly based upon it, or grow out of it.

The passage "he claims his vote" contains a personal pro-
noun, a transitive verb, an adjective pronoun and a noun ; and
the argument in favor of the shorter analysis, apparently
admitting that it will not do to strike out a passage made up
of words of the grades named, holds that they were inserted
in the text for the purpose only of defining or helping out in
some way the qualification of "residence." We have care-
fully considered this view, and to our minds the words "he
claims his vote" have in strictness as little to do with resi-
dence, considered merely as a qualification, as they have with
the qualification of sex, age, color or citizenship. In the first
place they have nothing to do with residence, considered as a
qualification, on first inspection; and in the second place they
cannot bear upon it by possibility except in one of three
modes. First—by defining the meaning of the term "resi-
dence," and that they do not attempt; second—by limiting

the duration of the residence, and that they do not attempt; or, third—by dictating in advance the particular county or district in which the citizen must reside in order to qualify himself to vote, and of that there can be no pretense; and it follows, unless there is some other mode than these in which the two things can be brought into the relation of description and subject matter described, that the words cannot be put to the use named. Take the parallelism already put, with slight verbal changes, to make the resemblance the more perfect. "A duly qualified grantee, who shall have recorded his deed in the county in which the land is located, shall be entitled to priority," etc. Here is, first—a fact, land; second—place, a county; third—an event which may or may not occur in the election of the duly qualified grantee, the registration of his deed; fourth—a relation, land in a county; fifth—a relation, the event of registration occurring in a county; sixth—a relation, that of absolute identity between the county of the fact and the county of the event; and to this a seventh element may be added—the advantage to result to the grantee who has registered his deed. Suppose it should be asserted that this analysis is false—that the words " who shall have recorded his deed" do not set forth a transaction or event as distinct from the fact of land or the location of land in a county, and that the only purpose of the passage was to define the essential legal nature of " land," or to determine in advance in what county or counties "land" must lie so that a deed of it shall be entitled to the benefit of the legal effect stated, or that there was a reasonable doubt as to what the passage meant—we should have exactly the same question as the one now presented; and should we doubt here, we might, and probably would, be called upon before a great while to doubt in the other case also. On these grounds we hold that the passage under discussion is properly resolvable into the six elements stated, instead of the three contained in the shorter analysis, and that result being given, all further controversy is precluded.

It may aid in the further illustration of this matter, how-

ever, if we refer to the provision in the Constitution of Ohio. It is as follows: "Every white male citizen of the United States, of the age of twenty-one years; who shall have been a resident of the State one year next preceding the election, and of the county, township or ward in which he resides such time as may be provided by law, shall have the qualification of an elector, and shall be entitled to vote at all elections." An analysis of this provision shows as results: 1st, residence— a fact; 2d, place—county, township, ward; 3d, a relation— residence in a county, etc., for such time as the Legislature shall prescribe. Here there is no event or transaction as distinct from the fact of residence, and the decision of the Supreme Court of Ohio that this provision does not touch the question of the place where the act of voting is to be performed, is, in our judgment, entirely correct. The shorter analysis given of the kindred provision of our own Constitution, assumes that the two provisions are identical—that is, that the words "in which he resides" and the words "in which he claims his vote," are the equivalents of each other. In view of the rule that "Courts are to collect the intentions of the lawgiver from the words used," we cannot adopt that conclusion. The one phrase sets forth a mere *status* of the elector, the other sets forth an *act* performed or to be performed by him after the status has been attained to. The words "he claims his vote" are in the one passage, and neither they nor anything like them is found in the other.

But another view still has been urged upon us, which, in effect, admits the analysis we have given to be correct, but insists that the event or transaction which constitutes its third result, does not involve the act of voting, or the act of "claiming a vote," but of claiming the abstract right of suffrage, or of claiming the "consequences or effect of a vote" upon the affairs of the county or district of the voter's residence, or a claim by a voter that his vote "shall be counted" in such county or district.

It will be observed that this view assumes that the object of the transitive verb "claims" is something distinct from

"residence" and intraterritorial to the county or district of the residence, and raises the question simply as to whether that object is the "vote" of the elector offered or deposited according to the constitutional method, or something that precedes the act of voting and exists independently of it, or something that follows a performance of the act of voting.

First—Are the just calls of the constitutional proviso fairly met by a naked claim or assertion or announcement on the part of a qualified elector that he is one, no matter whether the assertion be made abroad or at his civil home—on election day or otherwise—excluding also even any present wish to exercise the right claimed?

In the first place it is to be observed that the language of the passage quoted is not "claims the right to vote," but "claims his vote;" and in the second place if the passage as written should be thus rendered, though it would not be made absolutely meaningless thereby, still it would mean nothing of the slightest practical value. The rule of interpretation is, that "it is never to be presumed that the makers of a law had nothing in view in making it;" that a "statute [or Constitution] should never be so construed as to render it a nullity, or quite elude its force, but such a construction ought to be put upon it that it shall have its full force and effect, and not be made vain and illusory." (Smith Com. 671.) Now a claim involving the mere right to vote as its distinctive and sole subject matter, can be of no civil or political moment, and therefore it cannot be regarded as the real point of constitutional concern. Further, the right of suffrage is personal; it follows the person, and cannot, to a legal or any other intent, have a county or district or any other *situs* in itself considered. A claim so limited would merely manifest the faith or opinion of the claimant on a point of personal quality, and would be as valueless for public edification and use as his expressed opinion would be on the point of his personal righteousness.

Second—Is the interterritorial entity forming the object of the verb "claims," the "effect" or the "consequences" of a vote in the localities named, to the utter exclusion therefrom

25

of all that enters into and forms a part of the constitutional process of personal voting, by a ballot deposited in a ballot box, some Government functionary being present and co-operating?

We begin by calling attention to the meaning of the word "vote," when used as a noun; and first to its customary meaning, and second to its meaning in the phrase "claims his vote," as it stands in the Constitution. The word, as commonly used, has three meanings:

1st—"Ballot," which in itself considered is nothing but a written note or communication from an elector addressed to the Government, expressing the choice of the elector, but which has not as yet been delivered.

2d—The expression of wish, or choice, or preference, to the exclusion of the means by which or the method through which that result was accomplished. "The popular vote is but the expression of the popular will." In this passage, the word means, choice expressed or made known, without involving any particular means which the term itself distinguishes and characterizes. The result may have been reached through a ballot, or by *viva voce*, or otherwise.

3d—The third and last definition of the noun "vote" is expression of choice by or through a ballot, or by outcry or any other particular means by which the choice of the voter may be lawfully made known or communicated to others in the given instance. The word here involves both the previous meanings, and brings them into the relation of means and end.

These definitions, as will be at once seen, demonstrate the falsity of the adverse proposition in hand, by showing that the very assumption of fact upon which it is built up.has no foundation, and can have none by possibility, so long as the three definitions stated continue at once to fill and exhaust the meaning of the noun "vote." The allegation of fact involved in the adverse proposition is that in one of its known and established uses the word "vote" means the "effect" produced by it in public affairs in the course of a suffrage transaction—that is, it ascribes a fourth meaning to the word "vote," all of

whose possible meanings, as now understood, are exhausted by the three definitions which we have given.

There is undoubtedly an " effect" that follows the lawful expression or publication of an elector's choice, and of which that publication is the sole and manifest cause, as distinguished from the antecedents, or causes of itself; and that effect is the final impression made through or by the force of a " vote," as last defined, upon public affairs; but as loss of reputation is not a part of the libel, nor of the publication which causes the loss, so the effect of which we are now speaking is not a part of the publication in question; that is, it is not within the largest and most comprehensive definition of the word " vote."

There is only one way in which this last general result can be contravened, and that is by showing that the word "vote" when used as a noun has a fourth meaning distinct from the three named, and identical, too, with the additional meaning ascribed to it.   It is further to be noticed that the question of whether it has any such fourth meaning is, in one sense, a question of fact, and being such it is one upon which " general principles" cannot be brought to bear; and it is further to be specially noted that there is no source from which any reliable information upon the subject can be derived, except the dictionaries of the language and its literature, or if there is any other source it must be found in the mere provincialisms of 1849.

But the Constitution itself decides the question and to our entire conviction.   In the Constitution the word "vote" and its derivatives are used twenty-one times.   The word is used five times as a verb; the participle "voting" is used three times, and "vote" or "votes" appears twice as "ballot" or "ballots," as defined in our first definition, and eleven times as a noun used in the sense of the third or most comprehensive definition; and we rely upon this circumstance as a fact of manifest importance; and over and beyond this we cannot fail to notice the fact that the word occurs twice in section one, Article II, once in addition to the disputed instance, and in the proviso to that section: " Provided that nothing herein

contained shall be construed to prevent the Legislature, by a
two-thirds concurrent vote, from admitting to the right of suf-
frage Indians," etc.   As the word is used in this proviso it
imports choice manifested by or through the use of a constitu-
tional mean.   But there is another fact still more impressive.
In the second section of the Tenth Article the word is used not
only in the sense of our third definition, but the whole of the
conditions involved in that meaning are circumstantially de-
tailed.   " The Constitution that may have been agreed upon
by such Convention shall be submitted to the people at a
special election to be provided for by law for their ratification
or rejection.   *Each voter shall express his opinion by depositing
in the ballot box a ticket whereon shall be written or printed the
words* 'for the new Constitution,' or 'against the new Consti-
tution.'"   If there was ever a question of interpretation which
the rule of *noscitur a sociis* should dominate, awing all dissent
into silence; if there was ever an instance in which the mean-
ing of a word should be  determined by the concurrent voice
of all the dictionaries of the tongue in which the word is
found—it is the question of definition with which we are deal-
ing; and as the word appears in the Constitution eleven times
as a noun, and throughout all the varied relations in which it
stands, with the exception of two instances in which it means
"ballot," uniformly bears the meaning assigned it by the third
definition; therefore the rule of common reason, as well as the
rule of law, requires that that meaning should be given to the
word at the point and in the place where its meaning is dis-
puted; nor would the result be varied if the force of the word
as disputed should within its own special relations be doubtful
or ambiguous, for it is in such cases only that there is any
occasion to resort to the context or to make search after com-
panionship.   The particular maxim, *noscitur a sociis,* is appli-
cable only in cases of doubt.   Its distinctive office is to dispel
doubt, and all its value consists in its power to dispel it;
and wherever a doubt has been dispelled by means of it, a
certainty is revealed.   The meaning of the word "vote" in
the disputed instance is not doubtful in our judgment when

we consent to read it in the light emanating from itself in its own immediate connection, and certainly not when to the inherent force which it puts forth there is added the force imparted by traditions that became historical, and the further force imparted by the fact of habits of thought that became chronic, and habits of action that became muscular almost, both in England and this country, ages before 1849. But when from this advanced standpoint the fact of the companionship, and the multiplied coincidences hereinbefore referred to, have been duly weighed, and when it has been considered also that there is no question of "absurdity" or of "inconvenience" even involved, then and in that event, if any doubt lingers, it can, as we apprehend, find neither justification nor apology in any rule of interpretation recognized by law nor under any rule commending itself to the reason. On these grounds, therefore, we hold that the meaning of the word "vote" in the disputed instance, involves the act, and the activities of voting, as distinguished from its mere results. Treating the question as a question of fact, resolvable on the principles of circumstantial evidence—to which predicament it bears a manifest resemblance—it may be said, and truly said, that public justice has, in myriads of instances, claimed its extremest dues on evidence far less convincing.

Before leaving this subject it becomes necessary to consider the other form of words that has been suggested as setting forth the object on which the action of the transitive verb "claims" constitutionally terminates. The form is as follows: "in which he claims his vote shall be counted."

First—The words " shall be counted " are not in the Constitution as framed by the Convention and approved by the people. By the insertion of the words the Constitution would be amended—and perhaps improved, and perhaps seriously damaged in the large and in the long run—but in no sense would an insertion of them be an interpretation of the passage as it now reads. Phrases supposed or alleged to be of equivalent import may be advanced for the purposes of argument or illustration, but it always is to be remembered that the

phrase so advanced cannot be regarded as a test by which the meaning of a word or passage occurring in a written document is to be interpreted.

Second—But the words "shall be counted" suggest nothing differing in any particular from the fallacious " consequence " or the equally fallacious "effect" already discarded. But should it be said that the purpose or object of " claim" in the passage suggested is the mere manual process of counting, our reply is that a mere official counting of votes conducted by public functionaries is not a "vote," nor is it any part of a "vote," and much less is it any part of "his vote." There is not a man in the State who can say that he ever cast "his vote" at any "election" on the question of the process, as such ; and as to the results of the process, considered as a distinct subject matter of " claim," there is many a disappointed elector who can testify that he has known of election results arrived at by counting that were never any part of the object " claimed " by " his vote."

The discussion upon the meaning of the word "vote," in the disputed instance, as a detached point, terminates here. Its meaning is fixed, and if the word is to be struck out, there is only one thing that can properly be put in its stead—and that is the third definition in full detail, the entire accuracy of which the Constitution itself establishes.

Under the aspect which the question has now assumed, it is brought within the operation of a general principle, to which we shall for a moment advert. The franchise of voting is a special right, or power. The power has no existence independently of the restraints imposed upon it by the Constitution ; that is, no existence except as subject to the peculiar method prescribed by the Constitution, governing its practical exercise. The mode, on received principles, must be considered as of the essence of the power. Now, under the Constitution there is but one method, and that method excludes all others ; and, therefore, an exercise of the power can neither be constitutionally claimed, nor can it be constitutionally conceded, except as such claim shall be made or manifested in the

mode or after the constitutional method of the power. According to that method, when the Government meets an elector at a time previously appointed by itself, for the purpose of learning his personal choice, he can neither make it known to the Government, nor can the Government consent to know it, except as he communicates it by vote or ticket in writing, called in the Constitution a "ballot," which the elector, in his own proper person, delivers to the Government by the act of depositing it in a ballot box then and there in the possession and custody of the Government by its officers duly appointed; or, alternatively, by actually offering so to deposit it. When a ballot has been so actually deposited, or has been so actually offered by an elector, it becomes "his vote" in the sense in which these words are used in the first section of the Second Article of the Constitution; that is, an expression of the elector's choice through the one method of the Constitution; and as all other methods of "claiming his vote" are forbidden, it follows that a ballot not cast into the box under that method is utterly idle.

We shall now reproduce the whole passage in which the phrase "claims his vote" occurs, and then restate the same passage in a form sufficiently extended to include within it all the minor conceptions involved in the word "vote," and on the statement thus extended shall consider the question of what conclusion follows from it determining the main question:

"A citizen  *  *  *  who shall have been a resident of the State six months next preceding the election, and of the county or district in which he claims his vote thirty days, shall be entitled to vote," etc.

"A citizen  *  *  *  who shall have been a resident of the State six months next preceding the election, and of the county or district in which he offers or performs the act of offering to deposit, or in which he performs the act of depositing, a 'ballot' in a ballot box, shall be entitled to vote at all elections," etc.

The general question is, where is the act of offering a ballot to the Government, or the act of depositing a ballot in a ballot

box, to be performed? That question is now to be determined upon the constitutional provision as above extended, and it can be determined only by inspection—that is, by steadily looking at it and noting the responses of the intuitions.

Lest, however, the inspection should be embarrassed by some misgiving as to the accuracy of the extended statement, we will recast the statement, using the very language of the Constitution, found in the second section of the Tenth Article:

"A citizen   *   *   .*   who shall have been a resident of the State six months next preceding the election, and of the county or district in which such voter shall seek (that is, perform the act of seeking) to express his opinion by depositing in the ballot box a ticket, whereon shall be written or printed" certain words, etc.

On this last statement, expressed as it is in the very language of the Constitution, and on the terms used in the second statement, which terms agree with the terms of the last in every material particular, as well as on the first statement, extracted from the first section of the Second Article, which differs from neither of the others except as it is somewhat more condensed, it is in our judgment entirely manifest that the act of voting is to be performed within the State and within the county or district in which the qualified elector has his civil home.

In aid of this conclusion, we deem it proper here to add that it is not opposed to any opinion which the Legislature has expressed as yet; but, on the contrary, the Legislature has sanctioned the conclusion stated, and in two instances. The Act of 1863 and the Act of 1864 are both framed upon the hypothesis of its truth. The provision of the Acts, respectively, which bears us out in this statement is as follows: "Ballot boxes shall be opened at each place where a regiment shall be on that day * * * and the votes so given at such time and place shall be considered, taken and held to have been given by them in the respective counties of which they are residents." Had the Legislature enacted that an alien should be considered, taken and held to be a citizen; that

minors should be considered, taken and held to be of adult
age; that for voting purposes all colors should be considered,
taken and held to be white, it would have been no abuse of
terms to say that the Act bore upon its face an admission that
the Constitution established the distinctions which it was the
purpose of the Act to efface, and as clearly, too, as though the
Act had contained a "whereas," reciting the constitutional
provision at length, and further reciting that for certain rea-
sons it was thought proper by the Legislature to suspend the
constitutional rule for a limited time, or forever, and had then
proceeded to ordain that for all the purposes of canvass, and
for all the purposes of judicial determination, the distinctions
named should be taken and deemed as utterly obliterate.

Judge Redfield, of the *Law Register*, in commenting upon
a kindred provision in the New Hampshire statute, which the
Supreme Court of that State had pronounced unconstitutional,
in a learned review of the opinion, remarks that the Act con-
tains "a virtual admission upon its face that it did, unless its
provisions could be construed to mean something else besides
what their words expressed, conflict in express terms with the
provisions of the Constitution." So then it appears that the
only issue made up between the Act of 1863 and the Consti-
tution, or between the judicial and the legislative departments
of the Government, is as to the power of the latter to abro-
gate an admitted constitutional provision, or what amounts to
the same thing, to abrogate the whole instrument, as by ordi-
nance. If we had any misgiving as to the absolute correct-
ness of our own convictions as to the unconstitutionality of
the Act of 1863, and we have not, the legislative sanction
which the Act itself exhibits would go far toward removing it.

We now propose to consider the decision of the Supreme
Court of Wisconsin in *State ex rel. Chandler* v. *Main*, that of
the Supreme Court of Iowa in *Morrison* v. *Springer*, and that
of the Supreme Court of the State of Pennsylvania in *Chase*
v. *Miller*.

The fifth section of the Thirteenth Article of the Constitu-
tion of Wisconsin is as follows: "All persons residing upon
26

the Indian lands within any county of the State, qualified to exercise the right of suffrage under the Constitution, shall be .entitled to vote at the polls which may be held nearest their residence, for State, United States or county officers; provided that no person shall vote for county officers out of the county in which he resides."

The Court held that the proviso did not mean to prohibit the ,voter from being allowed to cast his ballot .outside of the county in which he resided, but to prohibit him from voting for officers of a county in which he did not reside. We have not seen the opinion delivered in the case, and therefore have no knowledge of the reasoning. The proviso, considered as detached from the context, presents a form of words analagous to those presented in the kindred passage of our own Constitution; and if the Court determined the meaning of the proviso *ex vi terminorum*, and without reference to the general rule prescribed in the body of the provision, and without any reference to or reliance upon any other provision contained in the Constitution at large—that is, if all the grounds of the Wisconsin judgment were like those upon which our conclusions are based, then the two conclusions stand opposed to each other necessarily; but should it appear that the grounds are unlike in any substantial particular, then the several conclusions are not necessarily opposed to each other, and both may be correct. We can, however, very well conceive that the judgment in the case cited was not based upon the words of the proviso alone, but that those words were construed in the light thrown upon their meaning by the immediate context, stating the general rule, and of which rule the proviso is a qualification. The immediate context states three conditions of fact, upon which the rule of voting, as unaffected by the proviso, is made to depend: 1st, Domicil in a county; ʿ ⅟, Actual residence on Indian lands therein; 3d. The "nr ,rest polls"—that is, the nearest point or place at or in ᾿ nich the Government should establish a poll; and the Cᵣ ᵤrᵥ may have considered that, inasmuch as the Constitution did not describe that point otherwise than by the use of the word "nearest,"

the Legislature was left at liberty to fix it, in its discretion, either within or without the county of the elector's residence, and thus have been brought to a conclusion directly opposite to the one it would have reached on the bare terms of the proviso. But if in fact the Court based its conclusions upon the proviso as detached from the context, then the correctness of the conclusion will be considered in connection with the conclusion in the Iowa case, which confessedly had no other basis.

The provision of the Iowa Constitution is as follows: " Every white male citizen of the United States, of the age of twenty-one years, who shall have been a resident of this State six months next preceding the election, and of the county in which he claims his vote sixty days, shall be entitled to vote at all elections which are now or may be authorized by law;" and the Court holds that the provision means simply that " a person cannot claim to be an elector in any other county than where he has such residence; that, in substance, is what is meant by the word claims."

There are three propositions maintained in the opinion: 1st. That the object, or " leading object," of the section was " to define who should be entitled to vote"—that is, as we understand it, to define the qualifications of voters; 2d. That, however, the particular passage—" in which he claims his vote" —does not relate to electoral qualification, for it is asked, " what weight, then, shall be given to the word ' claims?' Does the assertion of this right (the right of suffrage), or a claim to exercise it, constitute any part of the qualifications of the voter? In other words, if he is of the right age, sex and color, and has the requisite residence, is he not a qualified voter, though he may not claim to exercise that right? If so, then how can the claim of a right already perfect, add to its completeness?" 3d. That the import of the passage is, that "a person cannot claim to be an elector in any other county than where he has his residence"—which means, affirmatively stated, that a person who is a citizen, and who is of the right age, sex and color, and who has resided in the State six months, and in some county or district therein for thirty days next pre-

ceding the election, is a " qualified elector" of that county or district, and of no other.

We have already indicated our assent to the correctness of the second proposition, but it is apparent that its truth is wholly irreconcilable with the truth of the third—for in the one it is asserted that the passage does not bear upon the subject of electoral qualification, while in the other it is as broadly asserted that it does. Further, it cannot escape notice that some of the prominent terms of the passage to be interpreted are not found in the third proposition as stated, and particularly the words "his vote" are wanting, and the words "to be an elector" are substituted as the constitutional object of the word "claims" in their stead. But the words "to be an elector" and the words "claims his vote" obviously do not. mean the same thing. The one merely involves a declaration of personal quality or character; the other sets forth an event brought about, or to be brought about, by an elector after the character has been acquired. But we propose to further briefly examine the reasoning upon which the conclusion is based that the disputed passage does not bear upon the place where the act of voting is to be performed, but upon electoral qualification instead. The whole reasoning proceeds upon the word "claims." The word is defined as importing "the demand of a right, or of a supposed right," and we admit the entire correctness of the definition. It is then said that "a right or other thing may be asserted (claimed) by words or by other means." This as an abstract proposition—and that is the form in which it is put—is unquestionably true. It is then stated that the word "claim" (in the abstract) by no means implies that place or presence are essential to its potency or completeness. This is not only sound, but entirely apparent also. We hold it to be quite manifest, that there are many cases in which the citizen may make known his preferences to the Government by mere verbal statement, and that there are also cases in which he may express his personal choice to the Government on matters of public concern by a note in writing sent either through the General Post Office or by the hand of

a messenger, and it would not be a matter of the slightest importance whether he adopted the one course or the other. If the public mail should be used, it obviously would be of no practical consequence whether the point of delivery was in the county or district or even in the State of the citizen's residence ; nor would it be of any constitutional or other public concern where the Government functionary to whom it was addressed should happen to be when he received it. So far, the opinion obviously engages itself in laying down a basis of conclusion. All after that is conclusion merely. The basis is found in the word " claim," as detached—isolated. The opinion ascertains and declares its abstract definition to be, " to demand a right or supposed right," without in any manner involving the means by or through which, or the place at which, the demand is made. Having determined what the word includes, and also that it does not include a certain other thing in the abstract, the opinion concludes not only by declaring what the word does not mean as it stands in relation in the phrase " in which he claims his vote," but by stating affirmatively what the whole phrase means when considered in connection with its context. We have no disposition to indulge in the triflings of hypercriticism, but much prominence has been given to this opinion in argument; it has been repeatedly pressed upon our attention as a case which we well might follow as authority, even if it did not exactly accord with the convictions resulting from our own reasonings ; and in order to determine whether we could follow it without seriously imperilling the whole of that most important branch of the law which relates to the construction of wills, contracts, statutes, and Constitutions, we have felt it our duty rather than our privilege to subject the opinion to the same test to which we hereby subject our own.

As to the conclusion drawn by the opinion in question from the purely abstract definition named, we submit that it is a *non sequitur* to the whole extent of the terms in which it is stated. Let the process as such be inspected. The general question involves the meaning of a phrase containing some

fifteen words as related to the disputed question of place.
Some ten of the words are prominent as nouns or verbs, with
other words interspersed showing the relations between them.
The opinion begins by taking one of the more prominent words
out of its position in the phrase and ascertains its definition in
the abstract, and from that definition alone determines the
conjoint force of all the words as they stand in relation. The
conclusion may be right, or it may be wrong, but to every
intent, whether practical or conceivable, the question is left
just where it lay in the beginning, that is to say in hypothesis.
The so called conclusion is one only in name; in fact, it is the
original question itself in the guise of conclusion. Our pur-
pose has not been to examine into the correctness of that con-
clusion here, for that we have done already and in advance;
but on the other hand, our main purpose has been to test the
accuracy of our own conclusion by looking, not at the bare
conclusion of another tribunal, but by looking at the reason-
ing adduced in support of it; and we cannot surrender our
own convictions merely on the authority of the case named,
inasmuch as it nowhere brings them to the test of just chal-
lenge. We have a further remark to make touching the opin-
ion before finally leaving it. While it is true abstractly that
there is a diversity of modes in which a person may claim a
real or supposed right, still the opinion makes no allusion to
the fact that by the Constitution of Iowa, as by our own, there
is but one mode by which an elector can claim his vote, and
that is by the voter's depositing or offering to deposit a ballot
in person in the ballot box. And again, the opinion nowhere
touches the word "vote," either as detached or as it stands in
the Constitution. The meaning of that word as it stands in
position is not only entitled to consideration, but in our judg-
ment it presents one of the pivots of decision. It is the con-
stitutional object of the transitive verb "claims," and the fact
cannot be got rid of. And here we cannot fail to notice that
the argument submitted for the appellants also overlooks both
of the points to which we have just alluded.

On these grounds we do not feel at liberty to surrender our

own convictions, and pursue a course which would, in our judgment, throw the whole law relating to the construction of written instruments into hopeless confusion.

The Pennsylvania case previously referred to here claims a moment's attention. The Constitution of Pennsylvania uses the word "offers," where ours uses the word "claims." We have concluded that under our Constitution there is no mode of claiming a vote, except by offering it, and it follows that the word "claims," as it stands in our Constitution, is considered as the exact equivalent of the word "offers;" therefore, the correctness of our final deduction is sustained by the Pennsylvania decision. The correctness of that decision has never been doubted, and it has met the approval of the learned editors of the *Law Register*. In the Connecticut case cited by the appellants, the Supreme Court of that State expressed its concurrence in the doctrine of the Pennsylvania decision most emphatically. Speaking of time and place, the Court say: "In Pennsylvania the place was only prescribed by the Constitution, but that was sufficient to render an Act of the Legislature authorizing a reception of the soldiers' votes out of the State invalid." And in the Iowa case even the Pennsylvania decision is spoken of in terms of approbation, for the Court say: "Mr. Justice Woodward, in the case of *Chase* v. *Miller*, in what must be admitted to be a very able and almost exhaustive opinion, holds that the law allowing soldiers to vote outside of the boundaries of the State is in conflict with this section of the Constitution (referring to the Pennsylvania provision), and is therefore null and void." So it appears that the very cases relied on for the purpose of showing the incorrectness of our conclusion, themselves recognize the correctness of a decision that sustains it.

We have postponed an examination of the purely grammatical argument which has been suggested until it could be conveniently confronted with the case just cited. The reasoning is too elaborate and refined to enable us to review it here in full detail, but in substance it comes to this: That the passage "in which he claims his vote" is a "prepositional phrase,"

and that the words "county" and "district" are "its objects
of relation;" and from these premises the conclusion is
deduced that the provision performs the office of designating
the particular county or district in which the fact of a thirty
days residence must transpire in order to make the subject of
the sentence " a qualified elector." In so far as the reasoning
is based upon the language of the Constitution, it begins and
ends in the foregoing grammatical exposition. The answers
are as follows : 1st. The argument is inherently weak as being
purely grammatical. 2d. The conclusion, however it may be
in accordance with the premises assumed, is obviously falla-
cious when considered in itself, as a proposition of law. Is it
true that the Constitution of this State, either in the disputed
passage or elsewhere, " designates" the particular county or
district in which the fact of a thirty days residence "must"
transpire "in order" that a citizen may take on the character
of a qualified elector ? 3d. However the phrase in question
may be " prepositional" it is apparent that the corresponding
phrase in the Constitution of Pennsylvania was affected with
the same infirmity ; and, 4th. Nothing can be claimed on the
ground of the assumed " prepositional" character of the expres-
sion in the case stated, that must not be conceded to the one
of like quality (by parity) in the provision : " A duly quali-
fied grantee, who shall have recorded his deed in the county
in which the land is located shall be entitled to priority,"
etc. The " prepositional phrase" there, instead of " desig-
nating" the " particular" county where the land " must " be
located " in order" to entitle the grantee to priority, very
clearly designates the place at which the act of registration is
to be performed.

But another argument has been advanced which, when
analyzed comes to this, that if our Constitution fixes the place
of voting by force of the language in question, then the Con-
stitutions of New York and Kentucky are tautological or
redundant, inasmuch as it follows that those Constitutions,
respectively, repeat themselves on the question of place. In
the first place we do not appreciate the force of the reasoning,

and in the second place it proceeds upon an entire mistake of fact, as any one may see by referring to the Second Article of the Constitution of New York, and the eighth section of the Second Article of the Constitution of Kentucky.

An argument has also been asserted, which is based upon what may be called the history of constitutional changes in two or three of the States during the last half century—but the argument is too remote and the grounds are too evasive to require serious consideration. Grounds of the quality named, find no recognition in the rules of interpretation previously cited.

Our attention has been called to the case of *Capen* v. *Foster*, 12 Pick. 485, but the only point decided in that case was, that the Massachusetts statute, requiring a registration of voters, was not in conflict with the State Constitution.

We have considered the argument drawn by counsel from the eighteenth section of the Eleventh Article of the Constitution. "The privilege of free suffrage shall be supported by laws regulating elections, and prohibiting, under adequate penalties, all undue influence from power, bribery, tumult or other improper practices." It is said that "the power to regulate elections implies the power to provide the necessary means by which all electors may vote;" but in our judgment the scope of the implication is narrowed by the positive provision of Article Second, which we have discussed, and to the extent named.

Were it necessary, the correctness of the conclusion at which we have arrived might be vindicated by reference to another constitutional provision. By section two, Article II, "Electors shall in all cases except treason, felony, or breach of the peace, be privileged from arrest, on the day of election, during their attendance at such election, and going to and returning therefrom."

This section treats of attendance at elections, in connection with the impediment of arrest on civil process, whereby such attendance would or might be prevented, and exempts electors from such arrest, leaving them, however, subject to arrest for

27

treason, felonies, and breach of the peace. From arrest on civil process, the voters are, in the language of the section, "privileged." But if the act of voting, constitutionally considered, can be performed on California account, outside of the State's jurisdiction, it would not be true that the person thus voting in a sister State, or on national territory, or within the limits of a foreign nation, would be exempt from arrest in civil cases on the score of the "privilege," secured in "all cases" by our Constitution, to electors whom it regards as having the right to go on election days to the polls and deposit their votes in its ballot boxes. The admitted immunity of such extra-territorial voters from arrest, on California process, would not find its source in the "privilege" provided for in section two, but would result from the fact that they were beyond the reach of our civil justice. Nor would their immunity from arrest on our civil process be limited to the day of election, but would include every day of the year. Nor would their exemption be confined to freedom from arrest on our civil process, but would comprehend arrests on California process for the very crimes to which section two provides in terms that the exemption shall not extend. The result is too obvious to be mistaken. If a valid election for home officers can, under our Constitution, he held either in whole or in part outside of our territorial jurisdiction, in so far as the voters participating in such election are concerned, the section in question contains an impossible provision. The section states no distinction between elections or electors, but applies itself in terms to all elections and to all electors, known as such in constitutional idea. Looking at all the possible electors in bulk and considering them all as within and as acting within the jurisdiction on the day of election, the section extends to them all a "privilege" which, on one of the adversary hypotheses here presented, would be of great practical moment, but under the other would be not only unavailable, but destitute of all intelligible design. We do not put the argument here upon the ground that if it should be admitted that the Legislature has the power to fix the place of voting, that it might abuse the

power, and therefore that the power should be denied, but upon the ground that the hypothesis that the power exists is irreconcilable with the express provisions of section second.

So far we have made little allusion to the fact that the persons to whom the Act of 1863 relates are soldiers in the service of the United States, and we have omitted to do so for the reason that the section of Article II of the Constitution, already considered, suggests no distinction between one class of voters and another. The standard of qualifications erected by those sections stands, so far as those sections are concerned, as the common measure of all voters alike, and the requirement involved in those sections, that every voter shall offer his vote in the county or district in which he resides, is a rule dictated to every man who claims the suffrage.

But it is urged that by section four, Article II, duly qualified voters of this State, employed in the service of the United States and being absent from the State by reason of the exigencies of such service, are specially exempted from the operation of the general rule established by the previous sections of the same Article. This section is as follows:

" SEC. 4.   For the purpose of voting, no person shall be deemed to have gained or lost a residence by reason of his presence or absence while employed in the service of the United States; nor while engaged in the navigation of the waters of this State, or of the United States, or of the high seas; nor while a student of any seminary of learning; nor while kept at any almshouse, or other asylum, at public expense; nor while confined in any public prison."

And section nineteen, Article XI, extends the benefit of the provision to persons absent in the service of the State.

We shall not undertake to reply categorically to the argument of the counsel for the appellants, based upon this section; but shall proceed at once to a brief exposition of our own views of its meaning.

. It is obvious that the section does not add to the tests of

qualification as established by section one of the same Article. It is obvious, also, that it does not diminish the number of those tests, or in any manner vary their quality. Assuming, then, that the standard of qualification applicable to persons in the service of the State, or of the United States, or engaged in navigating the waters of this State, or of the United States, or of the high seas, on their own private account, and applicable, also, to students attending seminaries of learning, is no other or different standard than that which section one applies to aspirants to the suffrage without distinction, the question comes: What is, then, the distinctive function of section four? In what exact stead does it stand? The section answers these questions with great explicitness. None of the persons whom the section describes shall "lose their residence" by their absence. The qualification of residence having once been attained to by a person falling within any one of the classes named, that qualification shall sustain no detriment by reason of absence, and therein the section affirms the rule of the common law. The section does not contemplate soldiers as such, or in any manner touch them as such. They are within the section simply for the reason that they are "persons employed in the service of the United States." The section includes also within its beneficent range all persons engaged in navigating our internal waters for their own advantage, and the waters of the United States and high seas as well. Scholars at School are within it. The inmates of almshouses and other asylums at public expense are within it, and the section even saves the legal residence of the prisoner from deterioration during the confinement which holds him back from the polls. The section is enabling to no one. It gives no new right—it reissues no old right on new and easier conditions—but simply perpetuates a quality already won as against an absence that otherwise might bring it in question. How, then, does this section touch the point of contest here? That point does not relate to any one of the qualifications upon which the right of suffrage is conditioned, but to the question, Where shall the elector, in whom the right to vote

is fully vested, exercise that right? It is a question of place; rigidly, it is a question of venue, and section four exhausts itself upon a topic of different impression and substance.

But, further, if the Legislature is bound by section four (as is contended by the appellants) to send the ballot box to the soldier wherever he may be found, why, by parity of reasoning, is not the Legislature at liberty to send ballot boxes to qualified electors of this State employed in the civil service of the State or of the National Government, and absent from the State by the exigencies of that employment? And why is not the Legislature at liberty by force of the same section, to open ballot boxes at all convenient points within the State for the accommodation of the navigators of our internal waters absent from their respective counties or districts on the day of election? And also, to answer the just claims of our navigators on the high seas, by sending ballot boxes with them or in pursuit of them? And so, also, as to the sick in the hospitals, the inmates of asylums, and as to prisoners not disfranchised by the nature of their offenses.

A word further, and this opinion will be concluded. To a certain extent the case is argued in the brief filed for the appellants as though a question of disfranchisement of the California volunteers was involved, and that our decision went to their disfranchisement. If it be so, however we may regret it as individuals, we have no power to prevent it as Judges. But the case raises no such question, nor does this decision involve any such consequence. Though opportunity to vote at current elections has been lessened, still, diminished opportunity of exercising a right is in no just sense a divestiture of it. Nor does the admitted fact that the volunteers cannot vote with the same facility in their new relation as in the old one—in war as conveniently as in peace—result in the remotest degree from any provision of the Constitution inserted for the purpose of discrediting qualified electors of the State enlisting in the national armies; but, on the contrary, the soldier's diminished facility of voting is attributable solely to the accident of his absence. It is true of those employed in the civil service of

the Government as well as of those who are engaged in its military service, and it is true, also, of electors at large, that they are often kept from the polls by considerations of urgent convenience—by absence, voluntary or compelled—and by a great diversity of obstacles which they could not surmount if they would, and, perhaps, would not if they could. Considered in this point of view, there is absolutely no impediment or possibilities of hindrance affecting the military vote that do not affect the whole civil vote in like manner ; or, if there is any difference between them, it is one of degree only.

The record shows that five hundred and forty votes were cast for York for the office of Assessor in District Number One, and that five hundred and nineteen votes were cast for Weinbeer, who was the rival candidate for the same office. Of the five hundred and forty ballots cast for York, forty were cast by soldiers under the Act of 1863, and on that ground are to be rejected—leaving five hundred votes only standing to the credit of York, and that number is overcome by the five hundred and nineteen standing to the credit of Weinbeer. But it is alleged by the appellant, York, that Weinbeer's vote should be reduced by deducting thirty-five votes therefrom, cast for him at Phœnix Reservoir, on the ground of certain alleged malconduct on the part of the Inspector, in the matter of transmitting the votes to the County Clerk.

It is admitted that the votes in question were cast by duly qualified electors, on lawful occasion and at the proper place. These facts being found, their effect cannot be defeated by reason of the mere official delinquency of the Inspector. (8 Cowen, 102 ; 4 Cowen, 297 ; 20 Wend. 12 ; 5 Denio, 409 ; 12 Barber, 257 ; 8 N. Y. 67.)

The appellants further insist that the complaint does not state facts sufficient to constitute a cause of action.

All the cases were heard and determined upon an agreed statement of facts, and the only question before us in error is, whether the agreed statement will support the judgment—and to the sufficiency of the facts stated therein no objection is taken.

The judgments are respectively affirmed.

SAWYER, J., concurring.

Without repeating the accurate and exhaustive analysis of the disputed passage of the Constitution contained in the opinion of my associate, Mr. Justice Shafter, (in which I concur,) I propose to state briefly and in more general terms the conclusions at which I have arrived.

The leading rules of construction stated and relied on by the appellant's counsel are fully conceded; and especially that, wherever there is a reasonable doubt as to whether an Act of the Legislature is constitutional or not, the law should be sustained. Such is the united voice of a multitude of authorities, and I do not question the rule. I also yield assent to the proposition, that, if there is no restriction in the Constitution, either expressly or by fair implication, upon the power of the Legislature to determine the place where an elector must exercise his right of suffrage, then, electors may be authorized by the Legislature to cast their votes outside of the limits of the counties or districts in which they reside, or outside of the State.

The question, then, is, does the Constitution expressly or by plain implication, restrict the powers of the Legislature in this respect?

In examining the Constitution with a view of determining the question at issue, we must look to the language of the instrument; but the language must be construed according to its ordinary signification, when used with reference to similar subjects, as understood at the time when that instrument was framed. We are entitled and required to take notice of the history, condition and circumstances of the country prior to, and at the time of its adoption.

California had recently and suddenly become populated by immigrants from every State in the Union, who had from the time of their earliest recollection been accustomed, in the various States from which they came, to popular elections. These systems of elections had been in use by their fathers from the earliest settlement of this continent, and with greater

or less limitations and restrictions in the countries from which many of their ancestors emigrated. The universal mode of manifesting the will of the qualified elector was by vote, and the vote might be given in a variety of ways—as by ballot, by the voice, by a showing of hands, or dividing—a part going to one side and a part to the other. The last two modes, however, were confined to officers and matters of minor importance, except in legislative and other deliberative bodies. In elections by the people of all important officers, the only mode of voting known was by ballot, or by the living voice. In private corporations, and only in such cases, stockholders were allowed to vote by proxy. And so, also, in the House of Lords in England, by license of the king, a peer was authorized to give another peer his proxy to vote for him in his absence. But the principal, or his proxy, was required to be present. In the election of all civil officers, however, in every State in the Union, the personal presence of the elector was required at the place established by law for receiving votes, whether the vote was by ballot or by the voice, and these elections were always held within the district for which the officers were elected. The very idea of an election embraced the idea of a place appointed within the district for the meeting of the voters, persons appointed to receive and register the votes, and the presence of the elector in person to offer or claim his vote, to deposit his ballot, or announce his choice, by the living voice. Men had no other conception of the process of voting, or of offering to vote, or of claiming their votes. This conception, and these ideas were necessarily in the minds of the men who framed our Constitution, and of the people when they adopted it. They knew no other mode of voting, or of offering to vote, or of claiming their votes, and used the terms relating to the subject with reference to these conceptions, and in the sense in which they had been accustomed to employ them, and in no other.

The mode of voting established by the Constitution is by ballot, and there can be no possible difference of opinion as to what, in the minds of the people who adopted the Constitu-

tion, constituted the process of voting by ballot. With these ideas of those who framed and adopted the Constitution, and this understanding of the process of voting in view, the disputed passage must be examined. The solution of the question as to whether the Constitution puts any limitation upon the place, at which the process of voting is to be performed, must depend mainly upon the construction to be given to the phrase "in which he claims his vote," in the connection in which it stands. According to the well settled rules of construction, some meaning, some effect, must, if possible, be given to it. It has some office to perform. What is it? It is perfectly clear to my mind that it forms no part of the qualification of the elector, for under the Constitution a man can be a qualified elector without claiming his vote at all. If a white male citizen of the age of twenty-one years has resided in the State of California six months, and in the County of Sacramento, or any other county, thirty days next preceding an election, he is a qualified elector, whether he claims his vote or not. If residence in the State six months, and in any county, no matter which, for a period of thirty days, is sufficient to give him the right to vote, then the fact of *claiming* his vote is no element in the qualification. Nor, is a phrase which does not, and cannot, express an element in the qualifition of a voter, a natural, convenient or proper one to use for the purpose of describing or denoting a qualification. There is but one State, hence, residence in that particular State is required, but there are many counties or districts, but residence is not required to be in any given county, and for this reason no particular county need be designated. To describe the qualification, it is only necessary to say a white male citizen who has resided in the State six months, and in "a county," or "*some* county," or "*any* county," thirty days, shall be entitled to vote. In the Constitution of Maryland the term "*any* county" is used. Thus: Every free white male citizen, etc., who shall "have been one year next preceding the election, a resident of the State, and for six months a resident of the City of Baltimore, or of *any* county in which he may *offer* to vote,"

etc., shall be entitled to vote, etc. Here the qualification would certainly have been complete had that part of the sentence terminated with the words "*any county.*" The phrase immediately following could by no possibility add anything to the qualification.

In the Constitution of Georgia, the clause is, "shall have resided six months within the county," and there terminates, without any such phrase as "in which he claims" or "offers to vote." The phrase is not necessary, then, to complete the qualification by designating any particular county. I can conceive of no office which the phrase "*in which he may offer to vote*" in the Constitution of Maryland can perform, unless it be to indicate the county in which the offer must be made and the vote cast. So in our own Constitution the phrase, "*in which he claims his vote,*" is no part of the qualification of the voter, as we have seen, for he is, and necessarily must be fully qualified before he is entitled to "*claim* his vote" *at all*, and I am unable to assign any meaning to it, unless it was designed to indicate the county or district in which the right of voting must be exercised, and thus by a single phrase to link the right of suffrage to the locality within which it must be enjoyed. It appears to me to be no argument against this construction, that the qualification of the voter and the limits of the place within which the right of suffrage is to be exercised, are expressed in a single sentence. Constitutions are but the skeletons of systems of government. It is a merit in these instruments that the last degree of consideration has been attained. The Constitution of Iowa was selected as the basis of ours, for the reason, as was stated in the Constitutional Convention, that it was "one of the *latest* and *shortest.*" (Debates, p. 24.) It might therefore be reasonably supposed to be the best and most condensed. The body which framed ours had the Constitutions of all the older States before it. One of the prime objects in all these Constitutions was to fix the qualifications of electors, and define the limitations under which the right of suffrage should be exercised; and all contained provisions upon the

subject. In some of the older Constitutions, and especially in some of them of the New England States, these provisions partake almost of the prolixity of a statute. The later ones are more condensed. Nearly all, which require a county, district or precinct residence for a specified time, in addition to a State residence, as an element of qualification, have, in immediate connection with the specification of a county or district residence, a phrase similar or equivalent to ours, to indicate the place where the privilege is to be exercised, for the reason that it comes in conveniently in connection with the statement of a district residence; while those which only require a State residence do not admit of its introduction in that form, and hence require, and have, an independent and differently worded provision upon the subject, either in the same, or some other section.

Thus, the Constitutions which only require a State residence, and consequently require a different form of expression, are those of Indiana, Illinois, Arkansas, Minnesota and Oregon. The provision in the Constitution of Indiana will serve as an illustration of the mode of introducing the provision into the organic law of these States. It is: "Every white male citizen," etc., "of the age," etc., "who shall have resided in this State six months immediately preceding such election, shall be entitled to vote in the township or precinct where he resides." But, as before stated, when a county or district residence is required, the form of introducing it is different. Thus, as examples in this class of cases, in the Constitution of Rhode Island we have in one section, the phrase, "in the town or city in which he may *claim* a right to vote," and in another section, "in which he may *offer* to vote"—in that of Connecticut, "in the town in which he may offer himself to be admitted to the privilege of an elector"—in that of New York, "of the county where he may offer his vote"—in those of New Jersey, Iowa and California, "in which he claims his vote"—in those of Pennsylvania and Delaware, "where he offers to vote"—in that of Maryland, "in which he may offer to vote"—in that of Virginia, "in which he offers to give his

vote"—in those of Kentucky, Kansas, Texas, Michigan, Florida, Louisiana, Mississippi, and West Virginia, "in which he offers to vote"—and in that of Tennessee, "wherein he may offer his vote." (American Constitutions, Pub. 1864.)

In some of these, where the place of voting is still further limited to a subdivision of a county, as, for example, New York, there are other words of restriction than those above quoted, but in those where there is only a State and county limitation, no other words are added, as in Pennsylvania, Michigan, Kansas, Delaware, Florida, and California.

These phrases are used in the several Constitutions in a similar connection, with reference to the same subject matter and evidently with the same object in view, and whatever variation there may be in the phraseology, it is manifest to my mind, that they were intended to convey the same idea. When we have ascertained the meaning of one of them, therefore, we have solved the question as to all.

The Convention which framed the Constitution of Georgia evidently supposed that they had fixed the place of voting by terms less significant than those contained in our own, or any other of the Constitutions supposed to contain a restriction in this respect. They seem to have contemplated, that a condition of things somewhat similar to .the present might occur, and provided by an exception for elections to be held out of the county, when the exigency should arise. Had they not supposed the place to be fixed, there would have been no occasion for the exception so carefully provided.

The section is as follows: "The electors of members of the General Assembly shall be citizens and inhabitants of this State, and shall have attained the age, etc., and paid taxes, etc., and shall have resided six months within the county; provided, that in case of an invasion and the inhabitants shall be driven from any county, so as to prevent an election therein, such refugee inhabitants, being a majority of the voters of such county, may meet under the direction of any three Justices of the Peace thereof, in the nearest county not in a state of alarm, and proceed to an election," etc.

I find no other provision restricting the place of voting than is contained in this section, yet it seems to have been thought necessary to add the foregoing proviso. But the proviso would have been unnecessary upon the theory that the place of voting was not limited to the county in which the elector had resided for six months.

The Constitutions of New York, Kentucky, Louisiana, and Alabama, go further than that of Pennsylvania, and others like it, and expressly provide that the elector shall vote in the election district, parish, town, city, or precinct, etc., and not elsewhere. Thus, for example, the provision in New York is as follows: "Every male citizen, etc., who shall have been, etc., and an inhabitant of this State one year next preceding any election, and for the last four months a resident of the county where he may offer his vote, shall be entitled to vote at such election in the election district of which he shall be at the time a resident, and not elsewhere," etc., and from these last clauses it is argued that the framers of the instrument did not suppose the phrase "county where he offers his vote" fixed the place; but it must be noted that the "election district" is a much smaller territory than the county, and it was the intention to limit the place not to the county merely, but to the subdivision of the county—the election district; hence the necessity of the further provision, "shall be entitled to vote * * * in the election district of which he shall at the time be a resident." Thus far, then, there is no repetition.

But had it stopped here, no man could doubt, that upon the well settled principles of construction, the maxim, *expresio unius est exclusio alterius*, would apply and the place would be fixed. But they add, *abundanti cautela*, the words "and not elsewhere." The Constitution of Virginia provides that "every white male citizen," etc., (stating qualifications), "and *no other person*, shall be qualified to vote," etc. Can it be inferred from the provision, "and no other person," that without it the framers of that Constitution supposed the right of suffrage would not be limited to those persons who possessed the prescribed qualifications? Yet such an inference is just as legiti-

mate as a similar inference drawn from the provision "and not elsewhere," which was introduced into the Constitution of New York and some others, to give greater certainty and precision to the restriction intended to be imposed.

Upon a full and careful examination of the subject, it is clear to my mind, that all these different phrases : "in which he may offer himself to be admitted to the privilege of an elector"— "in which he may claim a right to vote"—"where he may offer his vote"—"where he offers to vote"—"wherein he may offer his vote"—"in which he offers to vote"—"in which he offers to give his vote"—"in which he claims a right to vote" —"in which he claims his vote," etc., are all different forms of expressing the same idea, and that idea is something outside of and beyond a mere qualification, and were intended to designate the limits within which the right of suffrage is to be in fact exercised.   If they have not this meaning, I am unable to give them any effect.

The Constitution of Ohio, North Carolina, and Wisconsin do not appear to contain any restrictive word whatever in this respect, and doubtless in those States the question of place is within the control of the Legislature.   Among the miscellaneous provisions of the Constitution of Wisconsin, wholly unconnected with the chapter on the right of suffrage, there is a clause which, it was contended, put a limitation upon the place.   This clause, however, seems to apply to a particular class of persons mentioned in that section.   But whether it does or not, the proviso is clearly susceptible of two constructions—one of which would not interfere with the power of the Legislature over the subject, and this construction the Court very properly adopted.

In the recent case of *Chase* v. *Miller*, 41 Pa. 418, the words of the Constitution of Pennsylvania, "in the election district where he offers his vote," were held to fix the place. · The reasoning of the Judge upon which the conclusion was based appears to me to be unanswerable ; and, in my judgment, the words "in which he claims his vote," in our Constitution, were intended to express the same idea.   The Supreme Court

of Iowa, upon reasoning that does not command my assent—and I say it with due deference to the learning and ability of that Court—decided otherwise, reversing the judgment of the Court below, which took a different view of the question. I am not aware that the correctness of the decision in *Chase* v. *Miller* has been questioned by any Court. On the contrary, the Supreme Courts of Connecticut and Iowa referred to it with approbation. It is also commended by Mr. Redfield, formerly Chief Justice of Vermont, now one of the editors of the "American Law Register," and a distinguished law writer, whose works are often cited in our Courts. (Am. L. Reg., June, 1863, p. 146.)

At the time of the adoption of our Constitution, the universal practice was for electors to vote in the county, district, town or precinct in which they resided, and, as a general rule, this manifestly should be so. It was, doubtless, not contemplated at that time, that any great emergency would arise wherein the very existence of the Nation would be at stake, as at present, and where a large portion of the electors would be absent, assisting in quelling a rebellion; hence, it did not occur to the framers of that instrument to make an exception in such a contingency, and none was provided.

Other States have found themselves embarrassed for similar reasons, and have been compelled to submit to the inconveniences resulting from elections held at an important crisis in the history of the country without the benefit of the voice of all their citizens. Some took the first opportunity to provide against future hazards of a similar kind by amending their Constitutions, as in the case of the State of New York. But, in making the required amendment in that State, the long established and safe principle of generally restricting the exercise of the right of suffrage to the immediate locality in which the elector resides was not abandoned. The object was wisely accomplished, not by changing the rule, but by engrafting upon it the exception required to meet the exigencies of such a condition of things as now exists. The following proviso was added to section one, Article Two :

" Provided that in time of war no elector in the military service of the United States, in the army or navy thereof, shall be deprived of his vote by reason of his absence from the State ; and the Legislature shall have power to provide the manner in which, and the time and place at which, such absent electors may vote, and for the canvass and returns of their votes in the election districts in which they respectively reside, or otherwise." (Rev. Stat. N. Y., Supplement Vol. 4, p. 111.)

It is not, perhaps, inappropriate here to suggest that if the people of California, with their present experience, were again called upon to amend their Constitution, while they would doubtless make some such provision as this, it is highly improbable, that they would leave a matter of such vital importance to the interests of the people, as the exercise of the right of suffrage to the unrestricted control of the Legislature.

After a most patient, long continued, thorough and anxious investigation of the question in this case, with a full appreciation of the responsibility resting upon me, and of the fact that a large and meritorious class of citizens, may, for the time being, be unable to avail themselves of the inestimable privilege of the right of suffrage, and of the still more important fact that the State in a momentous crisis in her history may be deprived of the benefit of the voice of all her electors, I am unable to come to any other conclusion, than that the limits within which the right of suffrage must be exercised are fixed by the Constitution, and that the elector must claim his vote in the county or district in which he has his residence.

SANDERSON, C. J., dissenting.

The only questions involved in the determination of these cases relate to the constitutionality of the Act of the Legislature of the 25th of April, 1863, enabling the California Volunteers in the military service of the United States to vote at elections held in that year for State and county officers. It is unnecessary to repeat here the provisions of the Act. It will be found at page five hundred and forty-nine of the Statutes of

1863. Its object was to afford to the qualified electors of the State, absent on the day of election, either from the State, or, if within the State, from their respective counties, in the military service of the United States, an opportunity to exercise their constitutional right of suffrage ; a measure which was eminently just, as all must admit, and which ought to be upheld unless it be repugnant to the will of the people as expressed in the Constitution.

No controversy is made as to the object or intent and meaning of the Act ; the only dispute being as to the true reading of certain provisions of the Constitution. The Act was passed upon the theory that the Constitution does not fix the place at which persons declared by its terms to be qualified electors shall perform the act of voting. If the theory be false, it is conceded that the Act is repugnant to the Constitution, and must be declared invalid. On the contrary, if the supposition be true, it is conceded that the Legislature has the same control over the place which it has over the time at which the act of voting is to be performed ; and the Act is constitutional unless it may be justly declared obnoxious to section eleven of Article I of the Constitution, which provides that " all laws of a general nature shall have a uniform operation," or unless, upon general principles, it is, by reason of its extra-territorial operation, repugnant to the general spirit and policy of the fundamental law.

In approaching the discussions of questions affecting legislative power it is proper to advert to certain fundamental principles which lie at the foundation of all reasoning upon that subject, and by the light of which, to a greater or less extent, every problem of constitutional construction must be solved.

At the commencement, all legislative power was inherent in the people. " In order to form a more perfect Union," etc., the people delegated a portion of this power to the General Government, as expressed in the Federal Constitution, and thereby practically parted with it forever. By the Act adopting the State Constitution they further exercised and exhausted

29

the power remaining to them to the extent of the rules of civil conduct therein clearly expressed, or necessarily implied; and by their own direct act placed the rules thus established beyond the reach of change, except in one of the two modes expressly provided in the Constitution. The residue was held in reserve to be used, as the convenience or necessities of Government might require, not by themselves directly, but indirectly through a body to be chosen by themselves, by constitutional appointment, called the Legislature, which was thereby authorized to announce and express the will of the people upon all questions upon which it had not been already, in terms or by necessary implication, expressed in the Constitution. Thus the Legislature represents and stands in the place of the people, and when it speaks it speaks the will of the people as much so as the Constitution itself; and, in regard to obligations imposed, the rules of civil conduct ordained by the Legislature are of equal force and dignity with those prescribed in the Constitution except in case of conflict, when the former must yield to the latter, not because the latter is of higher origin or of more solemn character, but merely because the same will which created both has so declared. Hence all legislative power which has not been expressly or by necessary implication granted to the General Government, or in like manner exhausted by the State Constitution, must be assumed to reside in the Legislature. And inasmuch as it is the prerogative of the people to prescribe rules upon all questions of civil conduct according as occasion may require, they cannot be precluded from its exercise in any case, unless by their own constitutional enactment they have already declared what the rule shall be. Hence the well settled rule of construction, that every Act deliberately passed by the Legislature must be regarded as binding and valid, unless the Act is clearly and manifestly repugnant to some provision of the Constitution. The people cannot be divested of their prerogative right to say what shall be the rule of conduct in a given case upon the mere conjecture or suspicion (arising from an incautious use of words which, by possibility, may mean less or more than was

intended) that they have already declared their will upon that subject. Nothing short of a constitutional prohibition, so explicit and clear as to leave no reasonable doubt upon the mind, can justify the Courts in declaring an Act of the Legislature null and void.

In his work on Constitutional Law, at page four hundred and eighty-two, Mr. Sedgwick upon this subject says: "The leading rule in regard to the judicial construction of constitutional provisions is a wise and sound one, which declares that in cases of doubt every possible presumption and intendment will be made in favor of the constitutionality of the Act in question, and that the Courts will only interfere in cases of clear and unquestioned violation of the fundamental law. It has been repeatedly said that every State statute, the object and provisions of which are among the acknowledged powers of legislation, is valid and constitutional; and such presumption is not to be overcome unless the contrary is clearly demonstrated."

In *Clark* v. *The People*, 26 Wend. 606, Chancellor Walworth said: " Courts ought not, except in cases admitting of no reasonable doubt, to take upon them to say that the Legislature has exceeded its power, and ·violated the Constitution, especially where the legislative construction has been given to the Constitution by those who framed its provisions, and contemporaneously with its adoption."

In *The Sun Mutual Insurance Company* v. *The City of New York*, 5 Sand. 10, the Superior Court of New York said: "The power of Courts of justice to declare the nullity of legislative Acts, which violate the provisions of the Constitution of the United States or of the State, is undoubted; but the power, for manifest reasons, is to be exercised in all cases with extreme caution, and never where a serious doubt exists as to the true interpretation of the provisions that are alleged to be repugnant."

So in Illinois it has been said that the inquiry into the validity of an Act, on the ground that it is unconstitutional, is an inquiry whether "the will of the representative, as

expressed in the law, is or is not in conflict with the will of the people as expressed in the Constitution; and unless it be clear that the Legislature has transcended its authority, the Courts will not interfere." (*Lane et al.* v. *Dorman et al.*, 3 Scam. 238.)

In Massachusetts it has been said that "Acts of a Legislature constitutionally organized are to be presumed constitutional, and it is only where they manifestly infringe some of the provisions of the Constitution, or violate the rights of the subject, that their operation and effect can be impeded by the judicial power." (*Foster* v. *Essex Bank*, 16 Mass. 245.)

In *The Farmers' and Mechanics' Bank* v. *Smith*, 3 Serg. and R. 73, the Supreme Court of Pennsylvania, through Mr. Chief Justice Tilghman, said: "We are now called upon to decide whether an Act of Assembly of this Commonwealth be void, because of its violating the Constitution of the United States. That this Court possesses the power, and that it is bound in duty, to declare a law void, when it violates the Constitution of this State or of the United States, has not been denied by the counsel for the plaintiff. It is a point on which I am well satisfied; but, at the same time, it is certain that it is a power of high responsibility, and not to be exercised but in cases free from doubt. Such has been the opinion frequently expressed by Judges of the highest respectability in different States, and sanctioned by the Supreme Court of the United States. I will not pretend to say that the meaning of that part of the Constitution on which this question arises is clear, but may safely say that it is doubtful. According to the established principles of construction, therefore, in doubtful cases, I am of the opinion that the law of the State is valid."

In *Fletcher* v. *Peck*, 6 Cranch. 87, Mr. Chief Justice Marshall said: "The question whether a law be void for its repugnancy to the Constitution is at all times a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative in a doubtful case. The Court, when impelled by duty to render a judgment, would be unworthy of its station could it be unmindful of the solemn obligation which that station

imposes.   But it is not on slight implication and vague con-
jecture that the Legislature is to be pronounced to have tran-
scended its powers, and its acts to be considered as void.   The
opposition between the Constitution and the law should be
such that the Judge feels a clear and strong conviction of their
incompatibility with each other."

It is said by the Supreme Court of Iowa (*Santo* v. *The State*,
2 Clark, 165,) that "A statute is not to be declared unconsti-
tutional unless the necessity be clear, decisive and unavoidable,
and therefore of two constructions, that which will make the
statute good is the one to be adopted."   So in *The People* v.
*Burbank*, 12 Cal. 384, Mr. Justice Baldwin delivering the
opinion of the Court, said: "The delicate office of declaring
an Act of the Legislature unconstitutional and void, should
never be exercised unless there be a clear repugnance between
the inferior and the organic law."

In *Hobart* v. *The Supervisors of Butte County*, 17 Cal. 30,
the same learned Judge said: "The legislative department,
representing the mass of political powers, is no further con-
trolled as to its powers, or the mode of their exercise, than by
the restrictions of the Constitution; such restrictions must be
shown before the action of the Legislature, as to the fact or
mode, can be held invalid.   Accordingly, the Legislature hav-
ing this general power of enacting laws, may enact them in
its own form, when not restrained, and give to them such
effect, to be worked out in such way and by such means as it
chooses to prescribe."

The same Judge, in an elaborate opinion delivered in *Smith*
v. *The Judge of the Twelfth Judicial District*, 17 Cal. 551,
further said upon this subject as follows: "There is no ques-
tion at this day of the power of the Courts to pronounce
unconstitutional Acts invalid, for this power results from the
duty of the Courts to give effect to the laws—of which the
Constitution is the highest—and which could not be adminis-
tered at all if nullified at the will or by the acts of the Legis-
lature.   But it is equally well settled that this power is not to
be exercised in doubtful cases, but that a just deference for the

legislative department enjoins upon the Courts the duty to respect its will, unless the Act declaring it be clearly inconsistent with the fundamental law, which all members of the several departments of the Government are sworn to obey."

In view of the foregoing well established principles we are called upon to interpret section one of Article Second of the Constitution, which is assumed to be ambiguous. Upon the one hand it is claimed that the section in question prescribes what shall be the qualification of an elector, and there stops. On the other hand it is further claimed that it also prescribes the place at which the act of voting shall be performed. If it be clear from the language used that it does fix the place, we are bound, regardless of consequences, to declare the Act in question unconstitutional. But, on the contrary, if it does not fix the place, or if there be reasonable doubt as to whether it does or does not, it is equally our duty, so far as the section under consideration is concerned, to declare the Act free from constitutional objection.

The rules of law governing the interpretation of Constitutions, statutes and private instruments are the same, and their object is to aid in ascertaining, from the language used, the true intent of the maker. They are necessarily of a very general character, and afford at best but an imperfect guide; and all who undertake the office of interpretation will find that they must after all rely mainly upon their own intuitions and perceptions. While a disregard of the strict rules of grammar is sometimes permitted, yet as a general rule the language used must receive an interpretation consistent with reason and grammatical usage, and never should the rules of grammar be departed from until they have failed to accord a satisfactory meaning to the doubtful words or passage. Their ordinary and popular signification should be given to the words used, unless from the nature of the subject it is apparent that some technical meaning was intended, yet as words individually or in combination do not always, even in common parlance, mean the same thing, it is necessary to consult the context for the purpose of ascertaining the precise meaning

intended, or the particular purpose for which the doubtful word or phrase has been employed. Hence, neither words, phrases, sentences, nor paragraphs should be isolated and interrogated apart; on the contrary, each should be interrogated in the presence of its companions, for each has a voice, and the response of one may operate to enlarge or restrict the response of the other. No reading can be true which does not closely observe their just relations to each other of words and phrases. Owing to the imperfections of language at one time, and at another to a want of care or skill on the part of the composer, it not unfrequently happens that adjunctive words or phrases are employed of a less or larger import in the abstract than is necessary to a clear expression of the idea intended to be conveyed. If such words or phrases are confined, upon the one hand, to their precise meaning in the abstract, or, on the other, allowed their full signification, the composer may be made to say less or more than he intended, and in the latter case to affirm two or more propositions, when in fact he designed to affirm but one. When such is the case, the words or phrases are themselves to be interpreted and their precise duty ascertained. Their abstract signification is to be expanded or trimmed to the true intent of the composer, as gathered from the general design and scope of the doubtful sentence or passage. But this process cannot be carried to the extent of divesting any word or phrase of all meaning; on the contrary, the presumption is that no word or phrase is idle, and therefore to each some duty, if possible, must be assigned. But it may be carried to the extent of divesting a word or phrase of a double or compound signification not essential to the main and leading idea affirmed by the predicate, and limiting its meaning to the purpose it was obviously intended to subserve.

"While interpreting such words or phrases," says Mr. Smith, in his Commentaries, at pages six hundred and ninety-one and six hundred and ninety-two, "great care must be observed that we do not, in all such cases, confound interpretation with criticism. The end of the latter is to find out what are the

words of the lawmaker, and whether the same are genuine or forged—whether any part or material parts have been foisted in or omitted or erased or altered. The end of the former is to find what was the intent and meaning, and to clear up that meaning when obscure—*to* ascertain the sense of ambiguous words—to determine the design when imperfectly expressed."

As I have already stated, the language to be construed should be first subjected to the test of grammatical analysis, and where the ambiguity is confined to a single sentence, as in the present case, it will generally be found that the rules of syntax afford all the aid required in order to determine the true intent and meaning of the author, or at least to determine whether he has affirmed the disputed proposition in language which admits of no reasonable doubt; for it is to be presumed, especially in respect to instruments of so solemn and deliberate a character as the Constitution of a State, in which simplicity and clearness of expression are studied, that the rules of syntax have been observed in the construction of its sentences. Such instruments are drafted by men of education, acquainted with the rules of the language in which it is written, and fully impressed by education and experience with the importance of stating separately and distinctly each organic rule of civil conduct.

A sentence is defined by grammarians to be an assemblage of words so arranged as to express an entire proposition. It is divided into principal parts and adjuncts. The principal parts are the subject, which is that concerning which something is asserted—the predicate, which is the word or words which assert something concerning the subject, and the object, which is that on which the act expressed by the predicate terminates. The subject and object may each consist of a word, or phrase, or sentence. The predicate is a verb with or without another verb, participle, adjective, noun, pronoun or preposition. A sentence is either transitive or intransitive; if the latter, it has no object.

Adjuncts are words used to modify or describe other words in the sentence. If they modify the subject or object, they

consist of adjective words, phrases or sentences. If they mod-
ify the predicate, they consist of adverbial words, phrases or
sentences. They are primary and secondary; the former attend
upon the principal parts of a sentence, and the latter upon
other adjuncts.

A phrase is defined to be two or more words properly
arranged, not constituting an entire proposition, but perform-
ing a distinct etymological office. They are of several kinds,
but it is necessary to define only that class to which the phrase
in the sentence to be construed, the meaning of which is the
subject of the present controversy, belongs: *i. e.*, a preposi-
tional phrase, which is one that is introduced by a preposition
and has a noun or pronoun (word, phrase or sentence) or a par-
ticiple for its object of relation.

Having thus referred to and briefly stated some of the lead-
ing rules of law and of syntax which should guide us in the
interpretation of language assumed to be ambiguous, I will
now proceed to read by their light the first section of Article
II of the Constitution, and determine how far its meaning is
clear, and how far, if at all, its meaning is doubtful. It is in
the following words :

" SECTION 1. Every white male citizen of the United States,
and every white male citizen of Mexico, who shall have elected
to become a citizen of the United States, under the treaty of
peace exchanged and ratified at Queretaro on the thirtieth day
of May, 1848, of the age of twenty-one years, who shall have
been a resident of the State six months next preceding the elec-
tion, and the county or district in which he claims his vote
thirty days, shall be entitled to vote at all elections which are
now or hereafter may be authorized by law; *provided,* that
nothing herein contained shall be construed to prevent the
Legislature, by a two-thirds concurrent vote, from admitting
to the rights of suffrage Indians or the descendants of Indians,
in such special cases as. such a proportion of the legislative
body may deem just and proper."

30

This section contains much which is not pertinent to the question in hand, and therefore only serves to distract the attention. It may, therefore, for the purpose of reducing the language to be construed to a more connected and compact form, be omitted without prejudice to the construction contended for by either side. Thus pruned it will read as follows :

"Every white male citizen of the United States, of the age of twenty-one years, who shall have been a resident of the State six months next preceding the election, and the county or district in which he claims his vote thirty days, shall be entitled to vote at all elections which are now or hereafter may be authorized by law."

Does this sentence, beyond all reasonable doubt, fix the place at which the act of voting is to be performed ?

The only words contained in the sentence which give any color to the idea that it does, are found in the prepositional phrase "in which he claims his vote." The chief task, therefore, which we are called upon to perform consists in ascertaining and assigning to this phrase its proper office; or in other words, in ascertaining the precise use to which it was applied by the author of the sentence. Let us then, in the first place, subject the sentence to a syntactical analysis. In doing this we are at liberty to substitute for words or phrases others which are admitted to be, in the abstract, their precise equivalents. By doing this no change is effected in the sense, but the full meaning and design of the author may be made more distinct to the perceptions of the reader. Only one change in this respect is desired. Strike out the words "entitled to vote at all elections which are now or hereafter may be authorized by law," and insert in their place the words, "a qualified elector," which all must admit is the precise equivalent in idea of the former expression. Thus modified, the sentence will read as follows :

"Every white male citizen of the United States, of the age of twenty-one years, who shall have been a resident of the State six months next preceding the election, and the county

or district in which he claims his vote thirty days, *shall be a qualified elector*."

This sentence is intransitive and, therefore, of the principal parts of a sentence has but two, viz : the subject and predicate. The subject (which is that of which something is affirmed) is " every white male citizen of the United States." The predicate (which is that part of the sentence which affirms something of the subject) is " shall be a qualified elector." The remainder of the sentence consists of adjective adjuncts, for it is obvious that none of them are adverbial, for the reason that they do not qualify the verb " shall be." The expression " in which he claims his vote," is a prepositional phrase, having for its objects of relation the words " county " and " district," and, therefore, performs the office of designating the particular county or district in which the fact of a thirty days residence must transpire in order to make the subject of the sentence a qualified elector.

There are two facts of residence, both of which must be found to accompany the person of the citizen in order to constitute him an elector. The idea of residence is complex, consisting of the ideas of person and place, both of which must be defined before a complete description of the qualifying effect of residence is obtained ; or, in other words, the ideas of person and place must combine in order to define the fact of residence, which is one of the elements of electoral qualification. In doing this we may describe the person by name, if the fact of residence is to be limited to an individual, or, where it is to embrace a multitude, we may designate the person by some general description which is applicable to all, as is done in the present instance by the words " every white male citizen of the United States." The same is true of the place. In this instance there are two facts of residence to be described. The person is the same in both, and one description suffices for both, but the places are different and require different descriptions. The two facts of residence are, first, a six months residence, and last, a thirty days residence. The place of the first is described by the words " the State." This is sufficient,

because there is but one State, and no further description is required. The place of the second is described in part by the words " county " and " district;" but this description is insufficient, because there are to be, as provided in the Constitution, several counties and districts. It must therefore be further described by adding words descriptive of the county or district. This could not be done by name, for obvious reasons. The counties and districts of the State had no names at the time, and if they had they could not have been used for the purpose in question, because the citizen may change his county or district at pleasure, and the counties and districts may be increased or diminished in number, or changed in boundary at the will of the Legislature. Therefore it was necessary to adopt some general expression which, in view of a changing residence, would be equally applicable to all counties or districts, and meet the elector wherever he might go. Hence the phrase " in which he claims his vote " was adopted. This phrase, in connection with the words " county " and " district," performs the same office in describing the second fact of residence which the word " State " performs in describing the first. Thus one purpose intended to be subserved by the use of this phrase is made manifest, and it is apparent that without it or some equivalent expression the manifest design of the author would have been imperfectly expressed.

From the necessity of the case, this phrase or some other equivalent in purpose and object had to be employed in order to indicate the county or district in which the qualification of a thirty days residence should be attained by the elector. No phrase could accomplish this except one which would in some manner associate the elector with the county or district. This could not well be done except by describing some act, claim, event or fact with which, in the nature of things, he must be connected. The necessity for some such expression is exemplified in every Constitution in the Union where the framework of the sentence is at all similar to the one in hand. And this is true, independent of the fact whether such Constitution does or does not fix the place of voting by other words

than those contained in the phrase employed for the purpose of designating the county or district in which the second fact of residence must subsist. Thus, the phrase used for this purpose in the Constitution of Massachusetts is, "in which he may claim a right to vote," which is equivalent in idea to the phrase used in our own. That used in the Constitution of New Hampshire is, "wherein he dwells." The Constitution of Connecticut has the following: "In which he may offer himself to be admitted to the privilege of an elector." In that of New York the expression is, "where he may offer to vote." In Pennsylvania and Virginia, "where he offers to vote." In Louisiana, Alabama, Mississippi, Kentucky and Missouri, "in which he offers to vote." In Ohio, "in which he resides." In New Jersey and Iowa the expression is the same as in our own Constitution. Although these expressions may, when abstractly considered, express different ideas, nevertheless they are manifestly used for the same purpose, and reach the same object by a different line of thought. They are used alike in Constitutions which do and do not fix the place of voting by the use of other words. In the former, necessarily they have been used only for the purpose which we accord to them. How, then, can it justly be said that words, which are confessedly used from necessity for a specific purpose, are, beyond all reasonable doubt, also used to indirectly accomplish · another purpose, originating from an entirely different conception, when in many instances in which they have been used for the former purpose they have not been understood by the parties using them, as accomplishing the latter?

That the phrase in question has been used for the purpose indicated, is not denied by counsel for the respondents. The claim that it also fixes the place where the elector shall cast his vote, is, in my judgment, completely negatived by the predicate of the sentence, which sums up the whole meaning of all that has gone before, and expresses it in the words, " *shall be a qualified elector.*" In that single expression all the conditions previously enumerated are united, and the complete

design and intent of the author is disclosed and affirmed by himself in language too precise and clear to admit of doubt. The expression is equivalent to saying, " *When these various conditions, which I have described, are found united in the same person, such person shall be a qualified elector.*" By it the author has himself expressed the whole design and scope of the sentence, viz : the definition of a qualified elector, and by it he has also qualified and limited the meaning and scope of his words to the expression of that design.   This is made more obvious by transposing the sentence so as to make it read as follows : " Every person shall be a qualified elector who is a white male citizen of the United States, who is of the age of twenty-one years, and has been a resident of the State six months next preceding the election, and of the county or district in which he claims his vote thirty days."   Manifestly, every word used subsequent to the predicate, "*shall be a qualified elector*," is merely descriptive of the individual repre- sented as the subject of the sentence by the words " *every person.*"

The ideas of qualification and place are not homogeneous, nor do they bear any just relation to each other, but are wholly distinct and independent.   They exist separately. Each is perfect and complete without the other.   A man is just as much a qualified elector when absent from the place of voting as when present.   In the former case he has the right to vote, but not the opportunity.   In the latter he has both.   Although these two ideas may be expressed in the same sentence, yet it is fair to presume that no writer who aims at even ordinary clearness of expression would inter- blend the two, but would give to each a separate position ; and ordinarily such a writer would accord to ideas so distinct a separate sentence.   The most ordinary observance of the rules of syntax would lead to the statement of distinct propo- sitions in separate sentences, or at least in separate parts of the same sentence.   These considerations are ignored entirely by the reading contended for by respondents.   The author, while in the midst of stating a complete proposition, is made

to pause and assert another of entirely different character, and bearing no relation whatever to the former, not in complete and apt terms, but in a mere phrase, which, by its own definition, does not contain an entire proposition, but which, by admission, is a relative expression, qualifying other words which are used for a foreign purpose.

It is safe to affirm that no writer of ordinary literary attainments who should take his pen with the deliberate intention of defining the qualifications of an elector, and also of defining the place at which such elector should cast his vote, would stop with the sentence in question. He would either add another independent sentence, or add to the sentence already written the words, "And every elector shall vote in the election precinct of which he is a resident, and nowhere else," or their equivalents. And it is permitted, and it is conducive to correct results, when we are searching language in order to discover the intent of the author, to put ourselves in his place, and assuming every theory which may be suggested, read his words for the purpose of determining how far they express our own conceptions of the subject. If they fail to do it fully and clearly, we may well doubt whether our conceptions have not gone beyond those of the author.

A further argument in support of our views may be drawn from some of the words used, when taken in connection with their definitions as given in other parts of the Constitution, and also in connection with the universal practice of the American people in selecting places at which polls are to be opened on election days.

Counsel for respondents seem to regard the words "county" and "district" as syonymous with precinct, or ward, or election district. Neither of these latter words, nor their equivalents, are used in any clause of the Constitution. The words "county" and "district" are of frequent occurrence. The word "county" is well understood, and is never used in the sense of an election district. By reference to other parts of the Constitution it will be readily perceived what is meant by the word "district," as used in the sentence in question.

The Constitution speaks of Congressional, Senatorial, Assembly and Judicial Districts only, and it is to them only the author refers.

An election district is a region of country within which a single poll is opened, and it is safe to affirm that the political history of the United States will rarely, if ever, and certainly not at the date of our Constitution, afford an instance where such a region embraced a whole county, or a Congressional, Senatorial, Assembly or Judicial District. It is confined to towns, wards, precincts, or other divisions greatly inferior in extent to "counties" and "districts." When therefore the idea of place is suggested in connection with the act of voting it does not remind us of counties or districts, but of towns, wards, precincts, and the like, in which a single poll is opened. Ordinarily therefore no person who intended to fix the place at which an elector should cast his vote would use the words "county" or "district," for by so doing he would fail to accomplish the object sought by restricting the elector to a particular place. The objects sought by such restrictions are safeguards against fraud upon the elective franchise. So far as it imposes any checks or restraints upon fraud or the abuse of the right of suffrage, the bare restriction to a county or district would be practically as ineffectual as no restriction at all. He would, therefore, in view of the end to be accomplished, use words designating a single poll, thereby requiring the elector to vote in the immediate place of his residence and among those to whom his qualifications are likely to be known, thus guarding against any supposed evils which might result from his being allowed to vote elsewhere. Therefore in view of the reasons which are urged in support of the rule confining the elector to a given place, it cannot, in any just sense, be said that the words "county" and "district" do fix the place, for they are words of too great jurisdictional import to warrant the belief that the supposed benefits of the rule can thereby be practically secured.

In support of this view reference may be made to the Con-

stitutions of other States, which confessedly fix the place of voting.

The language of the Constitution of New Hampshire is, " to vote in the town or parish wherein he dwells." The language of the Constitution of Connecticut is, " at the meetings of the electors, in the respective towns." That of New York is, " shall be entitled to vote at such election in the election district of which he shall at the time be a resident, and not elsewhere." That of Maryland is, " shall be entitled to vote in the ward or election district in which he resides." That of Kentucky is, " and he shall vote in said precinct, and not elsewhere." That of Indiana is, " shall be entitled to vote in the township or precinct where he may reside." That of Louisiana is, " no person shall be entitled to vote at any election held in this State, except in the parish of his residence, and in cities and towns divided into election precincts, in the election precinct in which he resides." Thus it appears generally that in Constitutions where the intent to fix the place of voting is manifested beyond all controversy, words of so broad a territorial signification as " county" and " district," as defined and understood in our Constitution, have not been used, but words descriptive of a much inferior territorial jurisdiction have been employed, for the obvious reason that the supposed evils resulting from the absence of such a constitutional restriction could not otherwise be sufficiently guarded against, nor the benefits thereof sufficiently secured. It is therefore reasonable to presume that the author of the sentence under consideration, had he intended to fix the place of voting, would have followed the examples cited above, and given full effect to the reason of the restriction.

We have not as yet examined minutely the phrase " in which he claims his vote," for the purpose of ascertaining upon what precise foundation the claim that it appoints the place of voting is grounded. Obviously it is not a complete sentence, and does not express an entire proposition when confined to its own terms—or if it does it asserts a proposition which is absurd upon its face; for unless some words, which

31

are not expressed, but understood, are added, the phrase does not represent the elector in the attitude of giving his vote, but in the attitude of seeking to obtain it. In order, therefore, to make sense of this phrase, we must presume that there are certain words understood which are not expressed. This is of frequent occurrence in all languages, and if doubt exists as to the true meaning of the author in such cases, it is the office of interpretation to supply the missing words which are necessary to complete the sense. But this rule does not extend to striking out words which the author has used and indifferently inserting others of our own choice. Hence the striking out of the word " claims" and inserting the word " offers" as suggested by counsel for respondents, is not supported by any rule of construction. Striking out and inserting is permitted for the purpose of sounding the meaning of the author; but in every such case the abstract import of the words inserted must be the equivalent of the abstract import of the words stricken out. Were we allowed to do as proposed by counsel, we should be writing Constitutions instead of reading them. There is no similarity of ideas between the abstract significations of the two words " claim " and " offer." On the contrary, they are directly opposed. To claim is " to call for," " to seek to obtain," " to demand something," " as a right," or " debt," or "obedience," or "respect." Thus the subject of the verb " to claim " is by the meaning of the verb itself always placed in the attitude of a recipient of the object or thing claimed. On the contrary, " to offer " is to present something for acceptance or rejection by another, thus placing the subject of the verb in the attitude of parting with the object or thing offered. Thus it appears, abstractly considered, that the two words, instead of being of equivalent import, are directly the opposite. We cannot, therefore, under any rule of law, or grammar, governing questions of interpretation, substitute the one for the other. And here we might drop this branch of the case, for the whole argument of the respondents is grounded upon the theory that these words are of equivalent import when used in this phrase, and may there-

fore be substituted the one for the other, without prejudice to the true intent of the author.   But in view of the importance of the question and the great interest which it has excited in the public mind, it is thought proper to extend the examination.

By the process of substitution, therefore, we can only insert in the place of " claims " the words " to call for," "to seek to obtain," " to demand," and the like.   But it is obvious that these words afford no better clue to the meaning of the phrase than the one already employed.   It is, therefore, clear that we have presented to us the ordinary case of words omitted or understood which must be supplied in order to give complete expression to the idea intended to be conveyed.   The full meaning of the author not being, in my judgment, very obscure, a variety of words suggest themselves, either of which will serve equally well to fill the vacancy which being incorporated complete the expression of the author's idea in all of the following forms :  " in which he claims his right to vote," " in which he claims his vote shall be cast," or "shall be counted," or "shall be received."

Neither of these expressions, by the mere force and effect of its own express terms, can be said to declare that an elector shall vote in the county or district where he has resided for the last thirty days.   They do not assert an entire proposition for they are still but phrases.   To the extent to which they do assert a proposition they do not assert a distinct and independent one, for they are still prepositional phrases, and by force of their own definition bear relation to words which have gone before, which words are terms confessedly in use to express an idea foreign to the alleged proposition.   The meaning, therefore, for which respondents contend does not find positive and affirmative expression in the words used, but if it has any foundation it is grounded entirely upon an implication, which in my judgment is too thin and shadowy to afford a secure support for that certainty of conviction which, as we have seen, is exacted by every rule of constitutional construction, in cases where the validity of an Act of the Legislature is

called in question and Judges are asked to declare it void. An inference so far fetched is more suggestive of the unreal foundations of speculation and conjecture than the substantial basis upon which must rest every implication that is made to dictate a rule of constitutional law. Before we can ground a rule of civil conduct upon a mere implication we must be satisfied that it is an implication which stands out clear to the view when called, and not one which refuses to appear unless summoned by microscopic power.

If the implication contended for exists, other eyes than mine have been unable to detect it, as I will now proceed to show.

The Constitution of New York, prior to the late amendment made to enable the volunteers to vote out of the State, upon this point read as follows:

"Every male citizen of the age of twenty-one years, who shall have been a citizen for ten days, and an inhabitant of this State one year next preceding any election, and for the last four months a resident of the county where he may offer his vote, shall be entitled to vote at such election, in the election district of which he shall at the time be a resident, and not elsewhere."

Here we have the phrase "where he may offer his vote," which, as all must admit, is much more favorable to the respondents' theory than the one which we are reading, and much more likely to beget the implication contended for. But this implication does not seem to have been perceived by the learned men who framed the Constitution of New York; for they, with those words fresh upon their lips, immediately proceed in other and apt words to fix the place of voting, not suspecting that they had already established it beyond controversy by a *necessary implication.* It is clear that they did not use the phrase in question for the purpose of fixing the place of voting, nor did they suppose that while engaged in defining the qualifications of an elector they had also inadvertently, by a necessary implication, declared where he should vote.

The framers of the Constitution of Kentucky seem to have been afflicted with a like dullness of comprehension, for they

were also unable to see the necessary implication in question, and stupidly repeated themselves in the same sentence. The following are their words:

"Every free white male citizen, of the age of twenty-one years, who has resided in the State two years, or in the county, town or city in which he offers to vote, one year next preceding the election, shall be a voter; but such voter shall have been, for sixty days next preceding the election, a resident of the precinct in which he offers to vote, and he shall vote in said precinct and not elsewhere."

Here the expression which gives rise to the necessary implication contended for is used twice; nevertheless, the implication does not seem to have been discovered, for the place is immediately thereafter fixed in other and certainly more explicit words. Thus, if the implication contended for does necessarily arise from the use of this phrase, the authors of the Kentucky Constitution have, in effect, stupidly repeated the same idea three times in the same sentence—twice by necessary implication, and once in express and unmistakable terms.

The first Constitution of Louisiana was adopted in 1812. It prescribed the place of holding elections, and the qualifications of an elector in separate sections. Section five of Article II provides that—

"Elections for Representatives for the several counties entitled to representation, shall be held at the places of holding their respective Courts, or in the several election precincts into which the Legislature may think proper from time to time to divide any or all of those counties."

By other clauses of the Constitution, all other State officers who are to be elected by the people, are required to be elected at the same time and place as Representatives. Having thus fixed the places of elections, the framers of the Louisiana Constitution proceeded, in the eighth section of the same Article to prescribe the qualifications of an elector in these words:

"In all elections for Representatives, every free white male

citizen of the United States, who, at the time being, hath attained the age of twenty-one years, and resided in the county in which he offers to vote one year next preceding the election, and who, in the last six months prior to the said election, shall have paid a State tax, shall enjoy the right of an elector; *provided*, however, that every free white male citizen of the United States, who shall have purchased land from the United States, shall have the right of voting whenever he shall have the other qualifications of age and residence above prescribed."

That the phrase "in which he offers to vote" was used in this section, in the understanding of the Convention, only for the purpose of defining the electoral qualifications of residence, is apparent from the fact that the place of voting had already been provided for in the fifth section of the same Article already quoted; and in addition the section bears internal evidence of the fact, which is found at the close of the proviso in the words, "*the other qualifications of age and residence above prescribed;*" for by those words it is expressly declared that the preceding part of the sentence had been devoted to the subject of *qualification* only.

A second Constitution was adopted in Louisiana in 1845, in which both of the foregoing provisions were retained in substance, and still a third bearing upon this question was introduced in the following words:

"No person shall be entitled to vote at any election held in this State, except in the parish of his residence, and in cities and towns divided into election precincts, in the election precinct in which he resides."

A third Constitution was adopted in 1852, in which all three of the foregoing provisions were retained in substance, and, so far as the present question is concerned, in precisely the same phraseology.

Thus it is manifest that neither of the three Constitutional Conventions of the State of Louisiana used the phrase "in which he offers to vote," for any other purpose than defining the qualification of an elector; and that neither of them supposed that the phrase which they were thus using, also, by a

necessary implication, established a rule for which they had elsewhere carefully provided.

The clause of the Constitution of Connecticut which defines the qualifications of an elector is expressed in the following words :

" Every white male citizen of the United States who shall have gained a settlement in this State, attained the age of twenty-one years, and resided in the town *in which he may offer himself to be admitted to the privilege of an elector* at least six months preceding    *   *   *   *shall be an elector."*

In 1862 the General Assembly of that State passed an Act to afford her volunteers in the service of the United States an opportunity to vote out of the State, of which, in its leading features, our Act of 1863 is a counterpart.   They also, in pursuance of a custom which prevails in that State, passed a supplemental Act directing the Governor to take the opinion of the Supreme Court as to the constitutionality of the Act, and, in case it should be held unconstitutional, to make proclamation of the fact, upon which all persons should be released from the duties imposed thereby.   The Governor accordingly submitted the Act to the Judges of the Supreme Court for their opinion as to its constitutionality.   The Judges were of the opinion that the Act was repugnant to the Constitution. And it is a significant fact, in this connection, that no allusion whatever is made to the foregoing clause of the Constitution in the very able opinion of the Judges delivered by Mr. Justice Butler.   (30 Conn. 591.)   Their opinion was grounded upon entirely different and independent clauses of the Constitution, clearly showing that in their judgment the clause in question exhausted itself in defining the qualifications of an elector, and afforded no ground for an implication that it also designated the place at which the elector should cast his vote.

Aside from what is said of Mexican citizens and Indians, the clause in our Constitution under consideration is a *verbatim* copy of a like clause in the Constitution of Iowa ; and it has been recently decided by the Supreme Court of that State, after mature deliberation, that it does not designate the place

of voting.   The process of reasoning differs from that which I have adopted, but the conclusion is the same.   How, in the presence of these many eminent and opposing witnesses, comprising the Constitutional Conventions of New York, Kentucky and Louisiana, and the several members of the highest judicial tribunals of two of our sister States, can it be justly claimed that the reading contended for by the respondents is correct beyond all reasonable doubt?

It is a familiar principle of constitutional interpretation that in doubtful cases the cotemporaneous construction of the legislative department of the Government should be followed by the Courts.   Our Constitution was adopted on the 13th day of November, 1849, and the first Legislature assembled on the 15th day of December thereafter.   Many persons who were members of the Constitutional Convention were also members of the Legislature and fresh from the labors of the former body.   At their first session the Legislature passed an Act regulating elections, which they divided into several chapters, each treating of a distinct branch of the general subject.   The first treats of "*general, county and special elections;*" the second of the "*qualifications and disabilities of electors;*" and the third of the "*place of holding elections, Inspectors, Judges and Clerks of Election,*"   Such are the headings of each chapter, respectively, as adopted and expressed by the Legislature. (Wood's Dig. 375 ) The first section of the chapter entitled "qualifications and disabilities of electors," is a *verbatim* copy, down to the proviso, of section one, Article II, of the Constitution.   Thus, for the sole and only purpose, as they themselves expressly declare, of defining the qualifications of an elector, they borrowed and used the language of the Constitution, which, it is now asserted, was used by a portion of them at least, only one month previously for another and distinct purpose as well.   In addition to this, in the next chapter, entitled " of the place of holding elections," they provided that there should be, not "*counties*" or "*districts*" for holding elections, but *precincts*.   And further on in the same chapter, at section twenty-nine, they prescribed the oath which, in case of challenge, should be exacted

of the elector before he should be allowed to vote.   Thereby the elector is required to swear, among other things, that he has resided in the State six months, and in the district, county, or township (as the case may be) thirty days.   In 1863 this oath was amended so as to allow an elector to vote for State officers in any part of the State, upon swearing to a six months residence, but leaving the law as it stood before so far as district, county and township officers are concerned.   (Statutes of 1863, p. 745.)   Thus, in the light of the Constitution, the Legislature have legislated upon this question of place from the commencement down to the present time, upon the theory that the Constitution does not designate the place, but leaves it, as well as the time, to their selection.

Sections two and three of Article II are cited by counsel for respondent in aid of the construction for which he contends. They are as follows :

" SEC. 2.   Electors shall, in all cases except treason, felony, or breach of the peace, be privileged from arrest on the day of election, during their attendance at such election, going to and returning therefrom.

" SEC. 3.   No elector shall be obliged to perform militia duty on the day of election, except in time of war or public danger."

It is argued that these sections strengthen the foundation upon which the respondents' alleged implication rests ; and it is said that the framers of the Constitution by thus providing aids to the unobstructed enjoyment of the right of suffrage, manifested their intention of confining the exercise of that right to California soil.   If this be so, it must be confessed that those eminent gentlemen unfortunately adopted a very obscure and roundabout way of affirming a very simple and straightforward proposition.

It is further said, in support of this not very plausible theory, that the exemption from arrest and militia duty as provided in these sections cannot be enjoyed by the elector, in

32

case of need, except upon California soil; that if the Legislature has the power to designate the place of voting it may direct all places of voting to be fixed upon foreign soil, and compel all who desire to exercise the right of suffrage to leave the State for that purpose; that hence (aside from the inconvenience of such a proceeding), it is in the power of the Legislature to practically deprive the elector of his constitutional right to freedom from arrest and militia duty on election day, thus making the two sections in question impossible and absurd.

Counsel should remember that in order to establish an absurdity they have no right, and no rule of logic will permit them, to commence by assuming an absurdity themselves. Yet it has been done in this instance. In order to show that these sections might by possibility become inoperative and absurd, it is, if I am permitted to say so, absurdly assumed that the Legislature will take advantage of its power and send all the electors out of the State to vote. Such reasoning, I must beg leave to say, does not rise to the level of argument. It may with equal fairness be used to prove that the Legislature has no power whatever because it may by possibility abuse it. The utter fallacy of such reasoning may be illustrated as follows:

It is admitted that the Constitution does not fix the time or appoint the officers of an election. So much, at least, is within the power of the Legislature. Suppose the Legislature should refuse to appoint either, what would be the consequence? This question the respondents have answered. The clause of the Constitution designed to secure to the citizen the right of suffrage would thereby become inoperative and absurd. Again: The Constitution provides that the Legislature shall protect by law, from forced sale, a certain portion of the homestead and other property of all heads of families. Thus it was intended that every head of a family should have a homestead. Suppose, however, that the Legislature should obstinately refuse to carry this constitutional intent into effect by proper and apt legislation, what would be the result?

Evidently, according to the respondents' theory, this clause of the Constitution would also become inoperative and absurd.

Thus it may be shown that every end and object of constitutional government may be defeated by non-action and abuse of power on the part of the Legislature. The argument leaves nothing to the good sense of mankind, without which Governments can neither be organized nor maintained. Against such consequences as the argument contemplates no safeguard can be found save in the good sense of the citizen, and for such results no remedy can be found save in the ballot box, or, if need be, in revolution. If the sections in question do not become inoperative and absurd until the Legislature fails to provide for elections within the State, and sends all the voters to a foreign soil to vote, it is safe to affirm that they will long remain living rules of civil conduct, securing to the citizen, so far as they go, the unobstructed enjoyment of his right of free suffrage. I am therefore unable to perceive how the respondents' theory is aided by the sections in question. Their object is to further assure the right of suffrage by adding other rights which make more secure and certain the enjoyment of the former. They were framed in aid of the right conferred by the previous section. To hold that they operate as restrictions upon it would be to convert aids into obstacles and friendly allies into foes. It does not follow that because the elector cannot for reasons beyond his control avail himself of certain constitutional immunities, he cannot enjoy when opportunity offers, a constitutional right expressly conferred. To hold that he cannot would be to countenance a glaring *non sequitur*.

It is fair to presume that the framers of our Constitution did not perform their task without consulting other Constitutions. It is apparent from the debates of the Convention that they had before them several if not all of the Constitutions of the other States. Our examination has shown that some of those Constitutions fix the place of voting and others do not. That some of them use the same or equivalent language as that found in our Constitution for the sole purpose of defining

the qualifications of an elector, which is manifest from the fact that other and different language is used for the purpose of designating the place of voting. The policy, therefore, of confining, by constitutional provision, the exercise of the elective franchise to the county or district of the elector's residence must have been suggested to the minds of the Convention, as well as the phraseology adapted to a clear and apt expression of such a rule. Yet we find that they have not adopted such, or equivalent phraseology. We know by comparison that they have in various parts made *verbatim* copies from other Constitutions : yet they have not copied in this particular of place from any of the Constitutions before them which, in other words than the phrase in question, fix the place of voting. It is therefore reasonable to infer that they wrote with their eyes open, and that they omitted to insert any clause designating the place, because they judged it wise policy to leave the place, as well as the time of voting, to the discretion of the Legislature. In view of that precision and clearness of expression which ought always to be observed in Constitutions, and which may be reasonably expected in all instruments of so solemn a character; and, in view of the many examples before them, in which language of even more weighty import than that finally adopted by them was used, for the sole purpose of defining the qualifications of an elector, and other language used for the purpose of fixing the place of voting, it is unreasonable to believe that the framers of our Constitution would have left so important a question to be solved by an implication so obscure that it does not rise much, if any, above the level of speculation or conjecture. On the contrary, the belief is reasonable, that had they intended to establish a rule upon this subject, which is second in importance only to the right of suffrage itself, they would have followed some of the examples before them, and grounded the rule upon express terms, and not left it tottering upon a doubtful implication.

It is worthy of note, in this connection, that in the debates of the Constitutional Convention upon section one of Article

Second, not one word is said in regard to the place of voting. The only question in the minds of the Convention, as is clear from the debate, was that of qualification.   The report of the debate covers fifteen pages, yet through the whole not one word was said indicating that in the understanding of the Convention the language used by them did more than define the qualifications of an elector.   (Debates of Convention, p. 61.)    This fact is significant and establishes beyond question the fact that the idea of place was not present to the minds of the Convention ; for it cannot be presumed that so important a feature would be passed by in silence through a long and elaborate debate upon the section in which it is alleged to have been incorporated, without a single word falling from the lips of a single member of the Convention indicating that he was aware of its presence.   To suppose that a feature of so great political consequence would be adopted without a word of comment, is to run counter to every intrinsic probability.

There are certain other sections of the Constitution which throw some light upon the question under consideration, and serve to fortify the conclusion that the place of voting is not prescribed in that instrument.   The only sections of the Constitution which directly speak or refer to the places of voting are the following :

Section 5, Article IV.   " Senators shall be chosen for the term of two years at the same time and *places* as members of Assembly," etc.

Section 2, Article V.   " The Governor shall be elected by the qualified electors at the time and *places* of voting for members of Assembly," etc.

Section 16, Article V.   " A Lieutenant-Governor shall be elected at the same time and *places* and in the same manner as the Governor," etc.

Section 20, Article V.   " The Controller, Treasurer, Attorney-General and Surveyor-General shall be chosen by joint vote of the two houses of the Legislature, at their first session under this Constitution, and thereafter shall be elected at the

same time and *places* and in the same manner as the Governor and Lieutenant-Governor."

For obvious reasons the foregoing quotations are made from the Constitution as it read prior to the amendments of 1863.

From the foregoing provisions it is apparent that all State officers, who were to be elected by the people, and members of the Senate are directed to be chosen at the time and *places* of voting for members of the Assembly. If then the time and places of voting are fixed in the Constitution, we would, in view of these provisions, expect to find them in the section relating to the election of members of the Assembly. But upon turning to that section it will be found that the time, though fixed for the time being, is left to the discretion of the Legislature and the places not fixed at all. It reads as follows :

Section 3, Article IV. "The members of the Assembly shall be chosen annually by the qualified electors of their respective districts, on the Tuesday next after the first Monday in November, unless otherwise ordered by the Legislature, and their terms of office shall be one year."

The places of voting mentioned in the first three sections above quoted, are manifestly not "counties" or "districts," but election precincts, wards or districts, in each of which there is but one poll. Aside from certain special questions affecting State indebtedness and amendments to the Constitution, the right of suffrage exhausts itself in the choice of public officers. The Constitution directs that all public officers who are created, and their election provided for by that instrument, so far as they are to be chosen by the people, shall be elected at a time and at *places* at which the members of the Assembly are chosen ; but neither the time, except temporarily, nor the places of voting for members of the Assembly, are designated. Thus the whole right of suffrage is to be exercised at times and places not appointed, but left to the selection of the Legislature.

In leaving this branch of the case it may be well to direct

attention to section nineteen of Article XI, which provides that—

" Absence from this State on business of the State or of the United States shall not affect the question of residence of any person."

On the score, therefore, of qualification merely, the absent soldier is as much entitled to vote as the elector who remains at home. All he needs in order to enjoy that right is the opportunity which the Act of 1863 affords.

Some stress has been placed upon certain words contained in the fourth section of the Act under consideration, it being claimed that they imply serious doubts on the part of the Legislature as to its validity. The words are as follows :

" And the votes so given by such electors, at such time and place, shall be considered, taken and held to have been given by them in the respective counties of which they are residents."

We cannot presume that the Legislature deliberately intended to pass an Act which they believed to be repugnant to organic law. On the contrary, every presumption of law points to an opposite conclusion. It is well known that the validity of the Act was mooted at the time of its passage, and it is possible that these words were used by the authors of the bill (knowing that the common law, in former times at least, dealt largely in fiction) under the impression that they might possess some magic power which, if otherwise questioned, would establish the validity of the Act. The words are idle and no more affect the argument as to the validity of the Act than they do its operation. They may be struck out without prejudice to either. They serve no other purpose than that to which they have been applied in this case. They afford a target at which wit, if inclined, may aim its shafts.

It is next claimed that the Act is repugnant to section eleven of Article I. That section is in the following words :

" SEC. 11. All laws of a general nature shall have a uniform operation."

The language of this section, like the laws of which it speaks, is of a general nature. So general as to leave in doubt, when by itself considered, the nature and extent of the rule it was designed to establish. The more one turns it over in his mind with a view to extract therefrom some intelligible rule for legislative guidance, the more strongly he will become impressed with the idea that this clause in our Constitution, by itself considered, does not rise much above the level of nonsense. The meaning of the predicate, however, is clear, for by a " uniform operation," I understand, as was said in *French* v. *Teschemaker*, 24 Cal. 544, an operation which is equal in its effect upon all persons or things upon which the law is designed to operate at all. The difficulty is in determining the precise definition of a general law. All laws operate upon persons or things. Are we then to understand that a general law is only one which operates upon all persons, or upon all things? If so, it is obvious that our general laws are very few, if, indeed, there are any of that class. Obviously such cannot be the meaning of the words " of a general nature," as here used. The word " general" comes from *genus*, and relates to a whole *genus* or kind; or in other words to a whole class or order. Hence, a law which affects a class of persons or things, less than all, may be a general law. If so, the California volunteers in the military service of the United States on the fifteenth day of July, 1863, may be regarded as a class, and the Act in question a general law. In that case it is not obnoxious to the constitutional objection on the ground under consideration, for it is not denied but that it operates uniformly upon all persons upon whom it was intended to operate at all.

This view is much the same as that taken by Mr. Justice Baldwin in *Smith* v. *The Judge of the Twelfth Judicial District*, 17 Cal. 554, in which case he had occasion to construe this provision of our Constitution. He there said :

" The language must be carefully noted. It is not that laws shall be universal or general in their application to the same subject, nor is it even that all ' laws of a general nature' shall

be universal or general in their application to such subjects; but the expression is that these laws 'of a general nature' shall be 'uniform in their operation;' that is, that such laws shall bear equally in their burdens and benefits upon persons standing in the same category."

Whatever of difficulty there may be in comprehending, when by itself considered, the precise office which this clause of our Constitution was designed to perform, it is removed when we read it in connection with the context of the Constitution from which it was manifestly borrowed.

As a matter of history, it is well known that our Constitution is in many respects copied from that of Iowa. Upon motion of Mr. Gwin, the Constitution of Iowa was adopted by the Constitutional Convention as a basis for ours, for the reason, as stated by him, that it was 'one of the latest and shortest. (Debates of Convention, p. 24.) The First Article was reported by a committee of which Mr. Norton was Chairman, and as first reported consisted of sixteen sections, including the one in question, bearing the same number which it now has. Speaking of the report, Mr. Gwin said the first eight sections were from the Constitution of New York, and all the others were from the Constitution of Iowa. (Debates of Convention, p. 31.) So far as it goes, section eleven is a verbatim copy of section six of Article I, of the Iowa Constitution, with the most important part left out. The latter section reads as follows:

" SEC. 6.    All laws of a general nature shall have a uniform operation; the General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities which, upon the same terms, shall not equally belong to all citizens."

Here the meaning of the first clause of the sentence, which, by reason of the "glittering generality" of the language, when by itself considered, is obscure if not unintelligible, is explained and made clear by the latter clause, which serves as a definition to the first. The first clause is the shell and the latter is

33

the meat; and it is a little surprising that our Constitutional Convention, if unwilling to take both, should choose the former. Viewed through the medium of the latter clause, the meaning of the first is made so obvious that they may not have detected its intrinsic obscurity, and with a view to brevity may have concluded to take the rule without its definition. However that may be, the meaning of the clause as used in the Iowa Constitution is obvious, and we must presume that when our Constitutional Convention borrowed the language they also borrowed the meaning, and designed that it should establish the same rule of legislative action which, by express definition, it is made to establish in the Constitution from which it is taken.

I am, therefore, of the opinion that the true intent and meaning of section eleven of Article I of our Constitution is to the effect that the Legislature shall not grant to any citizen or class of citizens privileges or immunities which, upon the same terms, shall not equally belong to all citizens. Thus interpreted, it affords a reasonable and salutary restriction upon legislative power, and in my judgment any other reading would render it meaningless and absurd.

Thus read it is obvious that the rule which it establishes has not been contravened by the Act of 1863, enabling California volunteers to vote outside of the counties of their residence, either within or without the State. The only privilege conferred by the Act is the privilege of voting outside of the county or district, or State of the voter's residence. The terms and conditions upon which this privilege is conferred and may be enjoyed are, that the voter on the 15th day of July, 1863, shall be in the military service of the United States, and thereafter on election day, and by the exigencies of that service absent on election day from the county of his residence. As to them the law is general, and makes no distinctions between individuals, but operates uniformly upon all. And it did not confer upon them any privileges or immunities which might not have equally belonged, " *upon the same terms,*" to all citizens. Every citizen, envious of the privilege conferred, could

have secured its enjoyment to himself by following the example of the volunteers, and leaving his household gods behind, enlisting in the military service of his country.

It is lastly argued in effect that the Act is, by reason of its extra-territorial operation, repugnant to the true intent and spirit of the Constitution. A like point was made in *Pattison* v. *The Board of Supervisors of Yuba County*, 13 Cal. 182, in reply to which Mr. Justice Baldwin, whom we have had frequent occasion to quote during the progress of this discussion, said:

" The generality of such a proposition creates an instinctive suspicion of its soundness. We do not deny that there may be a declared policy in a Constitution, as in a penal law or system of laws, and that it is not within the power of the Legislature to contravene this policy, although the act do not oppose the express language of any clause of the instrument. But this policy must be manifested by the terms of the Constitution fixing with precision the particular rule, and not be gathered by general inference or vague or uncertain speculation of what the framers of the Constitution designed but failed clearly to express. Mr. Justice Daniel, of the Supreme Court of the United States, took occasion, in a recent case, to disapprove of this course of reasoning, and, relaxing something of the austere dignity of that august tribunal, remarked that if the Judges were to adopt the notion that a law might be unconstitutional because of its supposed repugnancy to the spirit of the Constitution, they ought to employ a rapping medium to procure authentic revelations from that spirit."

But little stress has been laid upon this point. I know of no restriction upon the power of the Legislature to pass laws, except the Federal and State Constitutions, unless they be found in the laws of natural justice; but if any are found there they practically belong to the department of the moralist rather than that of the jurist. There is nothing in the letter of the Federal or State Constitutions prohibiting the Legislature from passing laws by which acts are authorized to be done outside of the State, and their effects to be felt within it.

If there is anything in either which prohibits it, it finds no manifestation in the language of those instruments, and we have no other medium by which to consult their spirits. There is not a State in the Union in which the Legislature has not passed laws authorizing the testimony of witnesses residing out of the State to be taken by deposition and returned to the State and read in actions and proceedings pending in the Courts, with the same force and effect upon results as if delivered orally by the witness. Thus the testimony of an absent witness is lawfully allowed to affect the final determination of the rights of persons and property. No more is done in this case. The analogy between the two laws is perfect. The ballots of qualified electors are authorized to be received outside of the State, and when brought within it to be counted and allowed their effect in the choice of public officers.

Upon this point, the Supreme Court of Connecticut use this language; "In relation to the time, place and manner of holding elections, the Constitution of the several States differ. In some of them all three are prescribed with that particularity which forbids all action by the Legislature. In others, neither are prescribed but the qualification required of the voter is fixed, and the power to regulate the time, place and manner committed to the Legislature; and in such States the reception of votes *out of the State may be constitutionally authorized.*"

In view of what has been said, it might be fairly claimed that it is clear that the Constitution contents itself with prescribing the qualifications of the voter and the manner of voting, so far as the manner is measured and filled by the ballot system, and leaves the *time* and *place* to be selected by the Legislature; but it is not necessary to go so far, as we have already seen, in order to establish the validity of the Act in question, for if, after mature deliberation, it can be safely affirmed that its validity is involved in reasonable doubt, our duty is as plain in the latter as in the former case, and we are bound by every principle of constitutional construction to declare that the Legislature has not usurped a power which it

does not possess, and that the Act under consideration is valid and free from all constitutional objections.

Entertaining these views, I am compelled to dissent from the conclusion reached in these cases by a majority of my associates. In my judgment the Court below erred in excluding the soldiers' votes, and for that reason the several judgments in these cases should be reversed. .

CURREY, J., dissenting.

ᵎ The first section of the Second Article of the Constitution of this State provides that every white male citizĕn of the United States, of the age of twenty-one years, who shall have been a resident of the State six months next preceding the election, and of the county or district in which he claims his vote thirty days, shall be entitled to vote at all elections authorized by law.

All the members of the Court are agreed that if an individual has these qualifications on the day of an election authorized by law, he is an elector and entitled to vote at such election; but there is, unfortunately, a difference of opinion among us as to what is the entire scope and meaning of the words "in which he claims his vote," and, of consequence, as to the extent of the functions of these words. While the Chief Justice is of opinion that they are purely words descriptive, or rather designative, of the county or district of the elector's residence on the day of the election and for thirty days immediately prior thereto, the majority of the Court hold that they also designate the county or district of the elector's residence as the place where his right of suffrage must be actually exercised. If the place at which the elector must vote, if he votes at all, is not fixed by the words "in which he claims his vote" as the same stand associated with the words "county or district," as found in the section referred to, then it is not denied that the Legislature may, by legal enactment, provide for and appoint the place at which the elector may exercise his right.

After having given to the subject a careful and earnest consideration, the inclination of my mind is that this section has reference only to the character of persons who may be electors and the conditions on which they become such, and that the subject of the place at which the right to vote must be exercised is not fixed by this or any other provision of the Constitution. While this is the result of my most deliberate judgment, I cannot regard the question free from doubt. The principle is well settled and firmly established that an Act of the Legislature is not to be pronounced unconstitutional unless it so appears to the judicial mind, beyond a reasonable doubt; and, recognizing this principle as fundamental and just, I concur in the conclusion to which the Chief Justice has arrived in his able and elaborate discussion of the subject, and believe the judgments in these cases ought to be reversed.